# FERRIE *vs.* THE PUBLIC ADMINISTRATOR.[*]

## *In the matter of the Estate of* JEANNE DU LUX, *deceased.*

A CONTESTED case of legitimacy, arising upon an application for grant of administration, decided in favor of the party claiming to be the lawful son of the deceased.

The presumption is always in favor of marriage. If the evidence merely show filiation, legitimacy will generally be presumed.

The force of these presumptions becomes greatly increased by the remoteness of the affair, and by the circumstance that the parents are dead, and the children alone are interested.

The essence of the marriage contract consists in consent, and forms are not requisite to its validity, except so far as they have been prescribed by the civil authority.

Before the adoption of the Code Civil, there was no statutory rule in France as to the extent and character of evidence to establish marriage and legitimacy, but the subject was reposed in the judgment of the tribunals.

Under the law of 1792, regulating marriages in France before the adoption of the Code Civil, failure to publish the bans did not invalidate the ceremony.

The consent of parents to the marriage of minors was not required by the Canon Law, as essential to the formation of the contract ; and by the ancient jurisprudence of France, want of consent was only cause of relative nullity and not absolute.

Enactments requiring the consent of parents are additions to the requirements of natural law, and are therefore construed strictly—and consent will be presumed until the contrary be shewn.

Under the Code Civil, the *status* of the child is determined by name, reputation, and treatment.

A simple declaration of filiation in the absence of other testimony is presumptive evidence of legitimacy.

By the ancient French law, an *acte* of baptism, declaring the child to be the son or daughter of the parents named in the *acte,* occupied the first rank among the proofs of a legitimate *status.*

CHARLES O'CONOR, *for the Public Administrator.*

I. As to a cohabitation or common dwelling, in the only material sense, *i. e.* as tending to make out a possession *de facto* of a *status,* of even as high a moral stamp as that of a faithful concubine, the claimant's case rests upon the evidence

[*] See 3 Brad. Surr. R., pp. 151, 249.

of De Galai. It covers a period of only two months, and that is the period of necessary confinement from publicity, by reason of the pains precedent and subsequent to childbirth. It is in a remote and obscure quarter, the outskirts of the town, and apparently removed from the access of any relative or any friend, except the servant-girl of her kind mistress, Anere.

1. If obscurity and concealment were not sought, why, as her mistress was kind, was she not permitted to remain in the house ?

2. This is the only time and the only place where they are shewn ever to have had a common domicil, unless you take the vague recollection of reports on this head, given by Valentin's sister, then a little girl.

And on this point let it not be said that the want of evidence that openly and without blush they occupied the same habitation, results from the loss of evidence : on the contrary, the evidence is ample, affirmative, and explicit, that during the whole period of the association of Valentin and Jane prior to the birth of claimant, until she went to her hiding place to be delivered, she lived as a servant in the house of Mr. Anere.

II. Then as to reputation ; this also rests solely upon the evidence of this same witness, De Galai.

1. She does not allege a reputation, or that she ever heard them called man and wife, or that she supposed them to be man and wife, or that they ever so called each other.

2. She proves a local name which, by inference, admits the idea that the strangers to her *status* residing there, supposed her to be the wife of her associate, and called her by his name.

This is just nothing at all.

3. She testifies that Mde. Anere called her Mde. Ferrié—this is a very slight bit of evidence.

From motives of worldly prudence and for the credit of her house, intending soon and gently to part with her, Mde. Anere

might have done this in talking to her servant ;—the witness may well be mistaken about it. (1 *Wend.*, 652 ; 3 *Sumn.* 438 ; *Best on Presumptive Evidence,* § 272 ;)—but,

4. Supposing this last fact to be undoubted, I say, in the language of Lord Brougham, in a recent case, 31 *Eng. L. & Eq. R.*, 19, "It is too feeble to balance the other circumstances of the case."

Argument.—The issue of law in this case is narrowed down to a very simple point. By the common law, (excluding the ecclesiastical law, which was not adopted in this country,) and which will be presumed to be the common law of all civilized nations until proof to the contrary is shewn, marriage is a mere consensual contract. And it is sufficient to prove the contract, by any proof satisfactory to the mind that the parties agreed to assume the relation of man and wife.

Arbitrary rules of evidence in another country, it is probable, would not bind here, since they belong to the *lex fori.*

The *lex loci contractus* governs as to the fact whether a valid marriage took place. (*D'Orsay* vs. *D'Orsay,* 9 *Watts.*, 351 ; *Sussex Peerage Case,* 11 *Cl. & Fi.*, 139 : *Birtwhistle* vs. *Vardill,* 8 *Cl. & Fi.*, 895.)

Art. 13, Tit. 4, of the law of 1792, enacts, that marriages contracted in contravention of the preceding articles of Sec. 1, of that title shall be invalid. The statute draws the distinction itself between what is merely directory and what is essential to the validity of the marriage. All the provisions of this section relate to matters which, by the general law, are esteemed vital and fundamental, unless it be the consent of parents. This ;—the consent of parents in the case of minors, —is included in a section which makes certain requisites vital and necessary to the validity of the contract. The provisions with regard to consent might be thus expressed,— "the age requisite for marriage with consent is fifteen years for males, and thirteen years for girls ; and without consent, twenty-one."

Now if Valentin Ferrié was not twenty-one, any alleged

contract of marriage was absolutely void, because the consent of his father was not obtained. If it be contended that Valentin, by virtue of the other provisions of the act could default his father, by reason of his not making a formal act of opposition, then there is no evidence that Valentin cited his father or gave him notice of the intended act.

Marriage may be formed *per verba de præsenti.* The language of the books as to marriage *per verba de futuro cum copulâ*, is only to be satisfactorily considered as embracing the proposition that the copulation is to be treated in itself as an assumption of the marital relation. (*The Queen* vs. *Millis*, 10 *Cl. & Fi.*, 555, 575, 588, 626, 648, 652.)

If the subsequent intercourse is shewn to have taken place under a then present agreement, then there will be a marriage. The previous agreement is only an item of evidence to fortify the presumption of an agreement at the time of copulation. Words of future marriage followed by copulation are only one of the modes of proving an agreement at the time of consummation.

Now as to the facts bearing upon this point,—the utmost proved is, that Valentin wished to marry this woman, his father would not consent, he left his father's house and consorted with her. The publication of intent to marry is subsequent to the copulation. It only shows that the parties intended to get married, if they could.

What evidence is required to sustain a consensual agreement to become man and wife? No particular grade of evidence is requisite. Whatever will properly convince the judgment is sufficient. Declarations of the parties are competent, and where the facts are ancient, hearsay will be admitted, and generally the most liberal rules be applied. The highest kind of evidence is direct proof of the admission of the parties as to a present agreement—the lowest, is cohabitation and reputation, that is, living together, having a common habitation, and being reputed to be man and wife.

We concede on the facts of the case that Jeanne Icart had from the first, and if you please throughout her life, what

would be called in France and to some extent here, a good general reputation in respect to chastity; she was not a common woman, not what would be called generally lewd. She affected to be pure and chaste, and set at all times a value upon her reputation as such. And Valentin Ferrié, the alleged father, had in all these respects a very good reputation, and deservedly. The case shews that in the estimation of her neighbors, a state of concubinage is not in the very highest degree dishonorable to the woman, where mutual affection exists and mutual fidelity is observed. Consequently, the witnesses express that she was not loose with other men, and that Valentin was not loose with other women.

She united herself with Du Lux very early, and that was by our law a valid marriage as early as 1808. They lived together openly and notoriously; she openly and notoriously assumed his name, and was permitted to do so; and there was that absence of shame on the part of each of them, which, like the purity of Adam and Eve in the garden of Eden, before they ate the forbidden fruit, indicated a consciousness of a lawful union.

There is no doubt that Valentin and Jeanne had sexual commerce, and that Ferrié is the fruit of their union; that the mother went from her ordinary domicil to some more private place, at or shortly before the birth of this child, where she was delivered with a considerable degree of privacy; that instantly at its birth, her offspring, contrary to the love and instincts of a mother for her first child, and contrary to the ordinary course of persons who are in a needy condition, was put out of the way to nurse; and that the intercourse between the father and the child appears to have been literally nothing, while the mother soon left that part of the country and separated herself from all connection with or report of the union she had with Valentin, and entered into the marriage state with Du Lux.

She did not disclose to Du Lux her previous intercourse with Ferrié before her marriage, and she always passed herself to him, as Jeanne Icart, a single woman. In his letters

he shewed solicitude as to her conduct and reputation, communicated to her the tattle he had heard about her at Toulouse, and overlooked any mention of her having issue by another man. Valentin was then living, and still she was about to enter into a bigamous connection,—if she had been previously married.

Her connection with Ferrié was not known at Biert, her domicil. The report as to her child only reached Biert after her return from America, and even then she did not communicate it to everybody. It is to be presumed, and there is no evidence to shew the contrary, that she kept the matter secret from Du Lux; this secrecy, if there were a marriage, was more · heinous than if there had been no previous marriage.

The fact of her having a child was then concealed from Du Lux ; up to what period was the concealment persisted in ? Before her marriage, she would not tell him, but afterwards it might be disclosed, or by long intercourse or some circumstance be discovered, or when greater confidence existed, have been voluntarily communicated.

When she returned in 1815, she admitted the child to be her own ;—she did not term him " her nephew,"—that phrase "nephew" is only adopted after her return to America. Cautiously adopted in all her correspondence, it was not to conceal the real relation from Du Lux—it was to save her reputation in America, from the imputation that would have rested upon her chastity, if having always concealed this early connection it were now disclosed. And this phrase she never departed from in any written document, but studiously observed it, and rigorously exacted from Ferrié that same formality in his most private and confidential correspondence. What was the motive for this continued concealment ? Valentin Ferrié was dead. The fact had been communicated to Du Lux ; and there is but one motive—the persistence in the line of secrecy which marked her conduct from the outset.

As to her declarations in this country after he came here,

that he was her son, they are inconsistent with her invariable custom in her letters, and with the course of conduct she had rigorously persisted in since her connection with Valentin. They are contradicted by the written testimony. It is to be noted that on her death-bed she did not recognize him as her son, but called him nephew ; that the witnesses who are well known to the court do not say she called him her son. And there was something singular in the way in which she acknowledged him—to one she said, " as the world goes they say he is my son ;" by this she meant, " people call him my son." Another witness says she speaks of Ferrié as her son, when she had taken " a little drop," and that " when she was sober she always spoke of him as her nephew." If she did call him her son, it proves irreconcilable inconsistency in her conduct. She was publishing the secret in her conversations and preserving it in her private correspondence.

If we examine the evidence bearing directly upon the question as to the facts connected with the alleged marriage at the time, it does not show any reputation that they were man and wife, but moreover there is the contrary reputation established, that their reputation was that of lover and mistress. At Biert there was no reputation at all that she was married or had a child—until she formed her connection with Du Lux. At Massat, the body of the testimony is that while she lived there she had a good reputation—that no one ever heard or knew of her being married, or having lived with Ferrié ; that there was a reputation she had been the mistress of somebody and that she had a child. When she returned to Biert, in 1815, there was a reputation that she had a child and that it was illegitimate.

What was the reputation at St. Girons ? There was none of marriage, but rather to the contrary.

As to the publication of the bans, what are its legal weight and value ? In questions of pedigree, when they become ancient especially, declarations, conversations and statements are evidence—old letters, and books and entries are evidence. Entries in ancient books of record are also competent. The

erasure of the bans and the word "null" were made at the same time and for the same purpose—that is the reasonable presumption. The notice was short—Valentin desired to marry if he could get the consent of his father, and not being able to procure it, the undertaking may well be considered to have been abandoned. If his father had appeared, and withheld his consent, and objected to the insufficiency of the notice, the entry might have been made in that way. It proves the parties were not married before that entry. It proves conclusively that Valentin was under twenty years of age. The want of consent is extrinsically proved. It is proved by this writing that Valentin wished to get married—and if he could have overcome his father's opposition he would have done so. The age was not important except that it should be stated as above twenty-one. The record therefore is to be taken as accurate in respect to his age. The consent of the father being necessary, they could not have married *per verba de præsenti*, and there is not only no proof that they did, but all the circumstances are inconsistent with the idea that they married or understood they had married. Their original cohabitation was undoubtedly not matrimonial, this is clearly shown by the publication of the bans. The certificate of the baptism shows that the relation of the parents was not represented as connubial. The other certificates in evidence show the custom in this respect. Now, in conclusion. 1. She never possessed the *status* of a married woman. 2. Ferrié never had the *status* of a married man. 3. The claimant has only one single circumstance supposed to be in favor of his *status*,—that he was called Ferrié : but this is no proof of legitimacy. 4. His father lived till he was eleven years of age, but does not appear to have recognized him. 5. As soon as born he was sent away—his mother then shunned him. 6. The settlement of his grandfather's estate does not recognize the claimant. 7. Ferrié never was recognized by the decedent as her legitimate son.

JOHN JAY, *for Benoit Carajolle, claiming as next of kin, and others.*

Three important points in the case have been determined by the Surrogate in the two decisions already made, as follows :

I. That the next of kin, in case of Ferrié's illegitimacy, are clearly entitled, and although from being non-resident aliens they are disqualified from administering, that disqualification may be removed by a change of residence to New York :

That their alienage, however it affects the mere question of administration, affords no reason for discharging their claim to the property : in that respect their standing here is not a matter of comity but of strict right.

II. That the act of the State touching illegitimate children is as to the next of kin a pure nullity.

III. That the *status* of Ferrié must be determined by the law of France then in existence, passed 20th of September, 1792, and which continued in force until the decree of Napoleon.

We now for the next of kin submit the following points :

I. That the Carajolles are the next of kin to the decedent (we refer to the proof in support of their claim in the case), and as such are entitled to inherit, inasmuch as :

II. There is not sufficient proof to justify a judgment by this court, that by the law of France referred to by the Surrogate, John P. Ferrié was born in lawful wedlock. (*See Ch. J. Parsons in Milford vs. Worcester, 7 Mass. R., 48, on strict compliance with statute requirements*).

This is not a case in which the Court can presume marriage from the fact of filiation, and dispense with proof of the fact. Where the evidence is such as to prove filiation

without affording any inference either way on the question of *status*, a presumption of legitimacy may be interposed (*Hubback on Suc.*, 250), for then it is presumed that the *concubitus* to which the birth is to be referred, was that of married persons ; but here it is clearly proven that the *concubitus* to which the birth of Ferrié must be referred, was unlawful, and that no marriage had taken place up to the 4th of May, 1800, the date of publication of intended marriage, when the boy had been begotten for several months. In such case, the boy could be legitimised only by a marriage pursuant to the *lex loci* between Valentin Ferrié and Jane Icart during the interval of about two months, that elapsed after the said 4th of May, and before the 30th of June, 1800, when the boy was born. Being begotten out of wedlock, his *status* in this Court is that of an *illegitimate*, until the marriage is shown.

The presumption of illegitimacy is inevitable, and can only be overthrown by satisfactory proof, and the burden of proof lies on Ferrié, who affirms the fact, and not on those who deny it. (*Hubback*, 250–1).

*First.* The evidence affords no direct proof of marriage.

The law of September 20th, 1792, in force at St. Girons in the year 1800, required every marriage to be solemnized as therein directed, (*Title IV., Sec. IV.*) and the act of marriage to be recorded simultaneously by a public officer deputed for the purpose, in duplicate registers. (*Title II., Art.* 2). The certificates and extracts from them are legal proof. (*Title II., Art* 6). The registers are deposited, one in the archives of the departmental directories (*Title II., Art.* 12), the other in the archives of the municipalities.

All persons were authorized to procure extracts of certificates from both sets of registers (*Title II., Art.* 18) at an expense of twelve *sous* for each extract of an act of marriage. (*Title II., Art.* 19).

No certificate or extract is produced from either of the registers, nor any reason given for the non-production. (*Hubback*, 239).

The fire which is said to have burned certain records, occurred in the year 7 (1798–9),—the records of marriage existing in St. Girons, according to the certificate of the Mayor, extend from the year 7 (which commenced September 2, 1798) to the year 9 (which commenced September 2, 1801).

No proof of any kind is offered that such an act of marriage ever existed—was ever seen or heard of by any one living or dead—nothing to rebut the presumption of law that the law of France was obeyed by the appointed officers —that the records were faithfully kept, and have been faithfully preserved.

*Second.* The evidence affords no proof of *reputation* of marriage either by

1. The testimony of living parties speaking to the existence of that reputation.

2. By the declaration and the conduct of their relatives towards them.

3. By the declaration and conduct of the parties themselves—either father or mother.

4. By the baptism of the child as legitimate.

5. By his acknowledgment, treatment and recognition subsequently as legitimate, by his father, his mother or his relatives.

6. By the facts and circumstances generally, or by any document, book, paper or title whatsoever, referring to such an act of marriage.

*Third.* The evidence affords certain negative proof that Jane Icart was not married:

1. That by the relatives, friends and neighbors of the parents in St. Girons, Massat, Biert and Castillon, there was no reputed marriage, and the child was looked upon as illegitimate.

2. The conduct of the mother after the child's birth and during her after life distinctly indicates that she did not regard herself as the lawful wife of Valentin Ferrié, or the boy as his lawful son.

3. That Valentin Ferrié was in May, 1800, a minor, that

minors by the law were incapable of marrying without the consent of their father, and that his father was openly and warmly opposed to the same.

4. That the certificate of baptism does not describe him as legitimate, and does not therefore imply legitimacy. (*Note 18 Sec.* 314 *of Code* 1. *Clerg.* 143, *Instructions from the Chancellerie in Paris to Foreign Consuls*). The instructions given to the clergy in one diocese, that of Angers, are as follows: "Care must be had to express in the act of baptism in addition to the names of the parents, that the mother is the wife of the father, otherwise the act will avail nothing towards proving the legitimacy of the child." The extract quoted is from the *Volume* "*sur les Sacrements*" *les baptêmes, page* 217. (122 *Conferences de Drocer D'Angers sur les Sacrements en general,*—*contained in the Library of College Francois Xavier,* 15 *St. N. Y.*)

5. That by section 228 of the Code Civil, adopted 1803, it was provided that a woman cannot contract a new marriage except after the lapse of ten months after the dissolution of the former marriage—that Valentin Ferrié was living in December, 1811, and that Jane was married to Du Lux in June, 1812, in violation of the law of France, if she had been previously married to Ferrié,—a fact justifying the presumption that she was not married to Ferrié.

6. That Ferrié the son was not recognized as an heir in the legal proceedings, had for the partition of the estate of his grandmother Francoise Cazes, who died 27th January, 1816, or that of his grandfather, Balthazar Ferrié, who died August 24, 1822, although his existence and relationship to Jane Icart were known in the neighborhood, and to some of the family.

*Fourth.* The evidence affords certain direct proofs that there was no marriage.

1. That the publication of intended marriage shows "*the summary mention in the margin*" *of its nullity,* ("*neant*"—*worthless—of no effect,) as provided for by Art. VI. of the 3d Section of title IV.,* indicating the opposition of the pa-

rents, and proving, in the absence of all explanation, that no marriage was then had.

2. The certificate of the Mayor of St. Girons that there is no marriage recorded in the register of the years 7, 8 and 9, the year 7 commencing September 2, 1798, and the year 9 ending September 2, 1801, must be held conclusive, there being nothing from which to presume that the records had been loosely kept, or in any way mutilated or destroyed.

Additional authorities quoted by Mr. Jay :

On character and burthen of proof: The burthen of proof is always upon the party who asserts the existence of a fact. (1 *Starkie on Ev.*, 362 ; *Wills on Evidence.*)

The circumstances proved must lead to, and establish to a moral certainty the particular fact sought to be proven. ( *Wills on Evidence*, 187.)

The conclusion drawn from the premises assigned as the basis must satisfactorily explain and account for all the facts to the exclusion of every other reasonable hypothesis.— ( *Wills on Evidence*, 187, 188.)

In regard to proof of reputation of marriage, (1 *Green-leaf's Evidence*, § 107 ; 1 *Phillips' Evidence*, 234.)

As to proof of legitimacy required in French Courts— (2 *Toullier Droit Civil Francais*, *Paris*, 1839, *p.* 141, *Arts.* 868, 869, 321, 873, 877, 878, 880, 884, 887, 888, 889, 892, 895.

That the provisions of the law which determines the mode of establishing the civil state of citizens of September 20, 1792, are not merely directory but prohibitory, and that the proof therein required is the best proof. (12 *Peters-dorff*, *Abridg.*, 585.)

R. H. SHERWOOD, *for Ferrié.*

I. Under the law of France, 20th September, 1792, marriage was a simple civil contract, and required only the consent of the parties to that contract ; it was not essential to

the validity of a marriage that all or any of the forms pre-
scribed by that act should be gone through with. (*Toullier
Droit Civil Francais, vol.* 1, *p.* 386; *Poutiant* vs. *Pou-
tiant, Journal du Palais, vol.* 8, *p.* 293; *In re Barbier
Journal du Palais, vol.* 11, *p.* 177; *Bertrand* vs. *Delatinne,
Journal du Palais, vol.* 2, *p.* 476).

II. We have evidence that Valentin Ferrié and Jeanne
Icart entered into this contract.

1. The certificate of publication of marriage is record evi-
dence of that contract.

2. The word "neant," written upon that document, signi-
fies simply that the notice is insufficient, not that the mar-
riage is void.

3. There is no mention of opposition made upon this
register of publication, and therefore the word "neant"
cannot mean that the document is void because Valentin
Ferrié was a minor. (*Art.* 4, 6 *and* 8 *of Sec.* 3, *Law*, 1792).

III. The act of marriage and the act of birth cannot be
produced, as the registers do not exist, or are not complete.
The applicant is, therefore, excused from producing them,
and the register of publication is sufficient. (*Toullier, vol.*
1, *p.* 403).

IV. Valentin Ferrié was not a minor. There is an error
in the age of Jeanne in the act of publication. Why not
of Ferrié?

V. If Ferrié was a minor, the marriage was good, because
no formal opposition was offered by the parents, and their
tacit consent thus given. (*Art.* 6, 8, *Sec.* 3; *Law*, 1792).

VI. If Ferrié was a minor at the time of the marriage, he
affirmed the contract by living with Jeanne after he came of
age. (*Fos.* 232, 243, 249, 268, 239 *of case; Toullier, vol.* 1,
*p.* 417).

VII. The certificate of baptism of B. P. Ferrié is an evidence of legitimacy. His uncle and aunt were the godparents. It is an ecclesiastical act, and not an act of the civil state.

VIII. Valentin and Jeanne intended marriage, and believed that they were married.

1. Valentin never married again.

2. Jeanne did not marry Du Lux until 1812, although she lived with him as wife from the year 1806, and Valentin died in 1810 or 1811.

IX. We have proof affirming the documentary evidence of the act of publication and baptism.

1. Cohabitation as man and wife, and Jeanne was publicly known as Madame Ferrié.

2. Valentin was present at the birth of the child, and furnished means for the support of the mother.

3. The child took the name of the father, and was thus recognized by the father.

F. BALL, *for Ferrié.*

In contemplating this cause, the large amount of property which may be affected by the decision of this application, seems utterly insignificant in comparison with the great question of personal right which is to be determined. Although the amount of money involved in a cause, as well as the character and condition of the parties litigant, always attract the attention, and excite the interest of spectators, they acquire no weight in the estimation of a court of justice, for such considerations are all to be prostrated at the feet of Justice, and in her pure presence all exterior circumstances are laid aside.

In a case like this, when it is shown by the testimony, that in both the marriages of the deceased, her hopes were

blighted, and her life embittered by unfortunate and unworthy alliances; it is also shown, that these circumstances contributed to develop in her character a strange complication of passions and emotions. At one time we see her exhibit the deepest affection for her son, at another, long periods of estrangement and seeming abandonment; now, fervent in her expressions of love, and again, severe in bitter invective; now, indulging in warm embraces, and again in cruel upbraidings; now, resorting to the most tender appeals, and, again, to the most scorching sarcasm; a long life spent in parsimony, she is nevertheless liberal in expenditures for his maintenance and education; at one time she styles him her son, at another her nephew; at one time, placing the Atlantic between herself and him; at another, recrossing the ocean, and with the most tender solicitude, searching for him through the wildnesses of the Pyrenees, and recovering him herself, when all efforts of others, employed by her to find him, had failed; again, placing the ocean between them, she returns to New York, but soon afterward caused him to be restored to her there; again, with harsh treatment driving him from her presence, and sending him, an outcast, to a distant state; and again, so soon as he became established there, recalling him from his prosperity to fix his home with her in New York, to be but again speedily driven away from her presence with imprecations; and, lastly, at the close of her incongruous life, at the age of nearly four score years, when all earthly ties were almost severed, we see that her mother's love survives all else, and with deep emotion she expresses her strong desire to behold her son once more before she dies.

Such being but a glimpse at the history of the mother and the son, it is not surprising, that the life of the applicant should be enveloped in darkness, or that doubts should be thrown around the fact of his legitimacy. And the history of France, at the period of his mother's marriage, and of his birth, distinguished as it was by the fearful reign of anarchy, increases in no small degree, the difficulty of making proof

of all the requisitions prescribed by the intermediary law of 1792, in respect to the acts of marriage, and of birth, and baptism. But, we trust, we shall presently see that it is not necessary for him to produce in this court all those acts, if other proofs sufficient to raise the presumption of legitimacy exist; nor, would it be necessary for him to produce them, even if this case were now on trial before a French tribunal.

Although the record in this case is voluminous, yet, much of the labor which would otherwise be necessary to bestow upon its investigation, may be dispensed with, in consequence of the conclusions already established by the elaborate opinion of this court, promulgated in March last, wherein the Surrogate held, after a very careful examination of the testimony then before him, that he could not deduce from the facts proved, that the applicant was an illegitimate son of the deceased; but, he thought it best to issue a commission to France, for the purpose of instituting further inquiries in that empire. That commission has been issued, executed, and returned, and it now remains for this court to decide, whether the commission discloses any legal evidence which overthrows the presumption of legitimacy which previously existed in favor of the applicant.

The case to be considered is this :

John Pierre Ferrié, a naturalized citizen of the United States, and a resident of the State of Ohio, has applied to this court, as next of kin, and sole heir at law of Jeanne Du Lux, deceased, who departed this life in the city of New York, in November, 1854, intestate, for letters of administration upon the personal estate of his mother. This application is resisted by the Public Administrator of the City of New York, on the ground, that the applicant is not the sole heir at law, or of kin in any degree to the deceased. Pending this application, letters of collection have been issued to the Public Administrator, for the preservation of the estate, and a counter-application has been made by him for full letters of administration.

The facts elicited by the testimony, show, that the relation-

ship claimed to exist between the applicant and the deceased, actually subsisted; but, although that relationship is not now denied on any side, the Public Administrator, aided by counsel, claiming to represent distant collateral relatives of the deceased, residing in the empire of France, claims, that the applicant is not the *legitimate* son of the deceased, and consequently, that he is not entitled to letters of administration, because not of kin to the deceased, and therefore not entitled to distribution under the statute of New York, in force at the death of the intestate.

In discussing this case, we shall endeavor to establish the following propositions:

I. A marriage contract between parties of the age of consent, not affected by a prior marriage, by insanity, incest or other like disability, if followed by consummation, and not declared null by proceedings known to the law, instituted by parties interested, IS VALID, and the issue of such a marriage is legitimate.

II. There is sufficient evidence before the Court to warrant the presumption in law, that a contract of marriage in fact subsisted between Valentin Ferrié and Jeanne Icart, at a period anterior to the birth of their child.

III. If no record evidence of the marriage, or oral testimony, or circumstances tending to prove it, existed, then there is sufficient proof to establish the legitimacy of the applicant, and consequently the legal presumption of the marriage of his parents.

I. As to the validity of a marriage between persons of the age of consent, not affected by a legal disability.

Marriage, like any other contract, consists in the consent or agreement of the parties; and although in all other contracts, except for necessaries furnished to infants, a contract under the age of majority may be avoided at the election of the infant, this contract, if made by parties of the *age of consent*, although that age is within the age of majority, cannot be avoided at the pleasure of either or both of the parties. And this distinction is founded in natural justice, because

rights accrue and consequences flow from this, which proceed from no other contract; and therefore it is that the different states of the civilized world have fixed upon certain periods of life, the attainment of which renders parties competent to enter into the marital contract—which periods are always within the periods fixed for the age of majority. By the common law, by the Roman Civil Law, by the law of New York, and the laws of many other States, the age of consent is fixed at fourteen for males and twelve for females; by the laws of Massachusetts, Illinois and Indiana, it is fixed at seventeen for males and fourteen for females; by the law of Ohio, it is fixed at eighteen for males and fourteen for females; by the Intermediary Law of France (20th September, 1792), it was fixed at fifteen for males and thirteen for females, and by the Code Napoleon at eighteen for males and fifteen for females. Parties not affected by legal disabilities may, in all these cases, give a valid consent, and make a binding contract of marriage; yet, under all these laws, certain formalities are prescribed, the observance of which, although required by statute, are merely directory; they are not indispensable to the validity of the contract. There must be mental and legal capacity to *consent;* for without consent there can be no marriage, inasmuch as consent is of the very essence of the contract. And no ceremonies are necessary to form a perfect marriage, according to natural law, to the canon law, to the Scotch law, to the law of New York, to the common law, or according to the law of France, either under the intermediary law or since. *Blackstone*, 1 *Com.*, 433, says, "In general, all persons are able to contract themselves in marriage, unless they labor under some particular disabilities and incapacities." The first of these disabilities, which are canonical, merely render the marriage voidable, and not *ipso facto* void, until sentence of nullity in the spiritual courts; the other, known as civil disabilities, render the contract void; and these are prior marriage, want of age, of consent, and want of reason.

The simplest form of words has been held to be evidence

of a contract of marriage. Thus, in the case of *Collins* vs. *Jessot*, 6 *Mod.*, 155, it was held by Holt, C. J., that the words, "I marry you," "You and I are man and wife," constituted a valid marriage in England.

In New York the same rule prevails. If a contract be made *per verba de præsenti*, although it be not followed by cohabitation, or if made *per verba de futuro*, and be followed by cohabitation, it is a valid marriage; and the consent of parents or guardians to the marriage of minors above the age of consent, is in no case necessary. (2 *Kent's Com., pp.* 85, 86, 87).

The same principle has been established in the cases of *Fenton* vs. *Reed*, 4 *John. Rep.*, 52 ; *Jackson* vs. *Winne*, 7 *Wend., Rep.*, 47 ; *Clayton* vs. *Wardell*, 4 *Comst.*, 230 ; *Turpin* vs. *Pub. Adm'r.*, 2 *Brad. S. Rep.*, 424, and in many other cases in New York; and the quere of the Surrogate, in *Jacques* vs. *Brautigam*, 1 *Brad. S. Rep.*, 499, seems to be answered by the foregoing authorities.

So in Ohio, where a rigid statutory system prevails; where a license issues by a Probate Judge, on the oath of the applicant; and where the minister of the gospel is required to produce in court proof of his ordination, and obtain a license to enable him to solemnize marriages, and is required to return a certificate of each marriage solemnized by him, within three months, to the court issuing the license, so that the evidence of such marriage may exist of record; and where the statute requires the *written* consent of the parents or guardians to the marriage of a minor; and where heavy penalties are prescribed against a judge, clerk, minister, or justice of the peace, for a violation of any of these provisions : nevertheless, a marriage contracted between persons above the age of consent, although minors, without the observance of these formalities, is not void : it is clearly illegal, but not *void*. The formalities of the statute are simply directory, and their non-observance merely subjects the parties implicated to the penalty of the law. It does not vitiate the contract.

In the case of *Wolverton* vs. *The State of Ohio*, 16 *Ohio Rep.*, 173, it was held, that the admission by a defendant indicted for bigamy, as to a prior marriage, may be given in evidence against him on the trial, to prove the fact of such marriage ; and in the case of *Shafher* vs. *The State of Ohio*, 20 *Ohio Rep.*, 1, it was held that a party married under the age of consent, might ratify the contract by cohabiting with his wife after he attained the age of consent. Thus, the Supreme Court of Ohio, notwithstanding the statute, affirms the doctrine of the common law.

These considerations lead us to the proposition, that although the formalities prescribed by statutes may not be observed, yet a contract of marriage will be held valid, because these formalities are merely directory; their non-observance not destroying the essence of the contract, but merely subjecting the parties implicated in disregarding them to penalties, and leaving the proof of the marriage contract to be made by other than the record evidence established by the statute. (*Cannon* vs. *Alsbury*, 1 *A. K. Marsh*, 76 ; *Holmes* vs. *Holmes*, 6 *La. Rep.*, 463.)

Chancellor Kent, in commenting on this doctrine, 2 *Comm.*, 89, says : " By the Scots law, a previous publication of the intention of the parties is required, though a clandestine marriage without such public notice, is still valid in law, and only subjects the parties to certain penalties." And he cites as his authority, 1 *Ersk. Inst.*, 91, 93 ; *McDouall's Inst.*, vol. *I.*, *p.* 112.

Mr. Bishop, in his treatise on Marriage and Divorce, § 1, 167, says : Assuming, then, that the contract *per verba de præsenti sine copulâ*, or *per verba de futuro cum copulâ*, is, at common law, a complete marriage ; we are next to seek for the rules of interpretation by which to determine whether, in a given case, a statute has altered the common law upon the subject. The leading rule, and one of great importance, will be found to be, that the marriage at common law is always good, notwithstanding the statute, unless the statute contains an express clause of nullity. This rule applies not

only to the statute as a whole, but to each several portion of it; so that if it declare the marriage void for non-compliance with a particular provision, it is good notwithstanding a failure to comply with any other provision." And Mr. Bishop cites many cases in support of that principle, and among them the case of *Rodebaugh* vs. *Sanks*, 2 *Watts*, 9, where, under the statute of Pennsylvania, which provided that *all* marriages should be solemnized by taking each other for husband and wife before twelve sufficient witnesses, after the publication of bans, the court held that those provisions were directory only, and the marriage was good, though not celebrated in accordance with the statute. And in deciding this case, Gibson, C. J., said, a contrary determination would bastardize the greater part of the children born for the last half century. And the same principle was held in New Hampshire, in the case of *Londonderry* vs. *Chester*, 2 *N. H.*, 268; and also in England, under Lord Hardwicke's act. (*Stallwood* vs. *Tredger*, 2 *Phill.*, 287.) In the case of *Dalrymple* vs. *Dalrymple*, 2 *Hag. Cons. Rep.*, 54, where Dalrymple, aged 19 years, a cornet in his majesty's service in Scotland, entered into a clandestine contract of marriage with Miss Gordon, which was never divulged until after his subsequent marriage in England with Miss Laura Manners— the court, Sir William Scott delivering the opinion, held the Scotch marriage valid, and decreed that Dalrymple was bound to receive Miss Gordon home as his wife, and treat her as such. This is a very strong case, for Miss Gordon had never changed her maiden name, and there was no cohabitation, nor any consummation other than that inferred by the court, from the fact that the husband occasionally gained a private admittance to his wife's father's house at a late hour of the night, and remained there until his stealthy departure in the morning. So in the case of *Rex* vs. *Inhabitants of Brampton*, 10 *East*, 282, where a marriage was solemnized in St. Domingo, in 1796, and the service was read in the French language by a person dressed like a priest, and interpreted into the English language by a person officia-

ting as a clerk; the marriage was held, by Lord Ellenborough, to be good in England. And marriages within the prohibited degrees of consanguinity, consummated by issue and sanctioned by death, are valid, and establish the legitimacy of the unfortunate offspring. Many cases of this sort have been decided. There is one in Illinois—*Bonham* vs. *Badgley*, 2 *Gilman*, 622—where a man married the sister of his mother, and the court held, that although such a marriage was within the Levitical degrees, it was not void, but only voidable; that, for all civil purposes, such a marriage was valid until a sentence of nullity was pronounced, and that this sentence could only be pronounced during the lives of both parties. No such sentence having been passed, the children were declared to be legitimate, and the widow received her dower. *Perry* vs. *Perry*, 2 *Paige*, *C. R.*, 501, is to the same effect.

Many other cases, as well in England as in the United States, might be cited if it were necessary; but we think enough has been shown of reason and of authority, to establish the proposition that the statutory requisitions are merely directory; and that a marriage contract between persons of the age of consent, followed by acts, and not declared null by proceedings known to the law, is valid, although it may contravene statutory regulation in respect to forms. And all statutes will be liberally and beneficially expounded for the preservation and support of such contracts, because such contracts, like contracts of infants for necessaries, are beneficial in their nature. (*Holt* vs. *Ward*, 2 *Strange*, 937; *Rodebaugh* vs. *Sanks*, 2 *Watts*, 9; 6 *La.*, 466.)

But it may be claimed on the other side, that although this may be the law of England and of this country, it is not the law of France, and that this case must be decided as if it were now pending in that empire. Although in deciding this cause, this court will seek for light there, as well from the laws as from the reported decisions of that empire, it will also keep in view the great principles which have been elsewhere established, and as nearly as possible conform its decisions to the

general current of authority. Especially, will not this court, after the lapse of more than half a century, adopt a strained construction of a statute at variance with natural law, and hold the issue of the contracting parties responsible for a full compliance on the part of his parents with all the requirements of an obsolete statute; and that too, when both parties to the contract are deceased. But, the same rule is applied in France. *Kent* in 2 *Comm.* 89, says, " in France, under the revolutionary constitution of 1791, marriage was declared to be regarded in law as a mere civil contract. The same principle was adopted in the code Napoleon; says Toullier, (*Droit. Civ. Franc. tome* 1, 494,) the law separates the civil contract entirely from the sacrament of marriage, and does not attend to the laws of the church and the nuptial benediction, which bind only the conscience of the faithful." And, according to *Toullier, tome* 1, 578, the omission, to comply with the prescribed publication, does not render the marriage void, whether celebrated at home or abroad. (*See also,* 1 *Toullier, Droit Civ. Francais* 386, 4 *ed. Brussels.*) And this doctrine is in perfect harmony with that promulgated in 1761, by *Pothier*, in *Trait des Con.* 15, when, in enumerating the various divisions of contracts, he says, " A fifth division of contracts is into those, which are subjected by the civil law to certain rules or forms, and those which are regulated by mere natural justice. Those, which in *France* are subjected to certain rules or forms, are, MARRIAGE, donation, bills of exchange and annuities. No other agreements are subjected to any forms or arbitrary rules prescribed by the civil law: and provided they contain nothing contrary to law or morality, and take place between persons able to contract, they are obligatory and induce a right of action. If the law ordain, that those contracts, the consideration of which exceeds the sum of 100 livres, shall be reduced to writing, they have nothing more in view, than to regulate the manner in which they shall be proved, *in case the parties dispute the fact* of their having taken place; but it is not intended, that the writing shall be considered as the substance of the agreement, which is valid

without; and if the parties do not deny it to have been made, they may be compelled to execute it, and the decisory oath may be even commonly tendered to those who dispute it; *the writing is only necessary for the proof, and not for the substance of the agreement.*"

The existence of the record evidence of a contract of marriage in France, as required by the forms of the French law, is therefore not indispensable, according to the learned author, whom we have just quoted, but the contract may be proved by other evidence or by the admissions of the parties. It certainly cannot be questioned by collaterals or strangers to the prejudice of the sole issue, after death has sealed the lips of both the parents. In the case of *Bertrand* vs. *Delatinne*, 2 *Journal du Palais*, 476, 3d. *Ed. by Ledru Rollin*, the marriage occurred on the 15th Prairiel in the year Five, and its validity was contested by some collateral relations. The Tribunal held, that under the law of 20th September, 1792, collaterals cannot demand a nullity of a marriage, contracted publicly and followed by constant possession, under pretext, that the formalities of the act have not been complied with. And in the same case, the court say, that under the same law a marriage is not null for having been celebrated without the usual publications. And a similar principle was afterward held in *Barbier's case*, 11 *Jour. du Palais*, 177, *Rollin's 3d. edition*. This case, decided in 1813, was, where Barbier was charged with bigamy and convicted. There was no record evidence of the act of the prior marriage or of its celebration according to law. It was proved by the production of the act of birth of the issue, and the court held, that by that evidence the prior marriage was established. The syllabus of the case is in these words: " Since the law of 1792, a marriage is not null for not being inscribed on a public register, if there exists other proof." And, again, the court presumed a legal marriage in the case of *Poutiant* vs. *Poutiant*, 8 *Jour. du Palais*, 293, *Rollin's 3d Ed. Cour de Cassation*.—This was a case, where a widower received into his house a servant to whom he promised marriage by a con-

tract made with her two months before the accouchement, but there was no celebration of the act of marriage. After the birth of the child the parents died, and children of the first wife questioned the legitimacy of the issue of the second; but, the court held, that where the child, whose father and mother are deceased, proves his legitimacy by the possession of the *status* conformable to his act of birth, it is not necessary for him to prove the act of the celebration of the marriage of his father and mother; and the court referred to *Merlin, Réper-toire de Jurisprudence, tome* XVII., *Title, Légitimation.*

From the foregoing cases it will be seen, that the same rules of presumption in law govern the courts of France, as govern those of England and of our own country; that the formal requirements of statutes are merely directory in France as elsewhere; and, that where no sentence of nullity has been had in the lifetime of both parties, a marriage contract is valid there, although the evidence of its existence may not be such as is prescribed by the law. Before proceeding to comment on the evidence, we deem it proper to insist, that the testimony of the witnesses, proving negatives in respect to marriage and legitimacy, ought to have no weight with this court; and, that the deposition of *Benoit Carajolle,* who acknowledges himself to be a claimant, ought to be suppressed. The testimony of that witness is clearly incompetent as against the applicant, on the ground of partiality, (*Pothier on Con.* 791,) and the witness, if otherwise competent, is too swift-footed to be entitled to much credit. His statement, that his mother told him, that Madame Du Lux told her on her return to France, that she had "come back to seek an *illegitimate* child," is too absurd and improbable to merit any credence; and, if such a statement were made, it cannot be received as proof, apart from its being hearsay evidence, because a mother cannot be permitted by her own statements, to bastardize her issue. And the same objection exists to the deposition of *Jane L. Lescoulie.* She, as it will be seen, is an aged, as well as a very ignorant woman, and is interested, from the fact, that she is aunt to the wife of a claimant, and, therefore, to say the

least, is inclined to be partial. This person attempts to defame the character of the deceased, by intimating, that an improper intimacy existed between her and *Mr. Espagnac's* son, while she resided at Massat; a charge not only not substantiated by any one other than Mr. Adone, but contradicted by his brother-in-law *Mr. Espagnac*, and by the weight of the testimony of all the other witnesses.

II. There is sufficient evidence to establish the fact of the existence of a contract of marriage between Valentin Ferrié and Jeanne Icart, before the birth of the applicant.

We claim that, from the 4th day of May, 1800, there was a valid marriage contract between the parties. We will first review the facts of the case respecting the marriage; next, consider the requirements of the intermediary law of 1792; and lastly, ascertain what opposition was made to the marriage, if any, and by whom, and its legal effect.

1. As to the facts. Valentin Ferrié was a son of Balthazar Ferrié, a respectable tanner residing at St. Girons, in the south of France. Jeanne Icart, the only daughter of a respectable widow of that name, who resided at her death at Biert, was employed as a domestic in the family of M. Anere, a gentleman residing in St. Girons, in the adjoining house to that occupied by Valentin Ferrié's father. Jane, being little and pretty, was known by the diminutive of " Jeanine," and was usually called by that name by her acquaintances. She had formerly lived in Massat, as well as at Biert. At all these places her reputation was good and her character irreproachable. Espagnac says at Massat "She lived very modestly, and led a virtuous life." Benazet says, "Her character, during the time that I knew her, and while in this part of the country, was always good, and that of a modest girl. I know that her reputation in Massat and the neighboring village, was irreproachable." Rogale says, "Her character was good; I never knew anything against her reputation." Noble, at Biert, says, "Her reputation was good while she lived here." And Servat, Pages, and Lafitte, at Biert, and Daffis and

Catharine Ferrié, at St. Girons, all testify that her reputation was unsullied. On the other hand, Adone says her general reputation was light, and Lescoulie that she had the reputation of being a gallant, loose girl. But the weight of the testimony is clearly against them. And Valentin's character was good. Daffis says he was a respectable young man, industrious, and a good worker; and Catharine Daffis says his character was very good. In no case is it impeached by any witness. We therefore assume it to be established by the proof, that the characters of both Valentin and Jeanne were good. Thus situated, and he with the prospect of a lucrative trade, on the fourteenth Floreal, in the year eight of the French Republic (4th May, 1800), they appeared before the Mayor of the city of St. Girons, where they both resided, and made a formal publication and record of their marriage contract, and caused notice to be posted at the door of the Municipal Hall, of their intention to "execute the *acte* of their marriage on the 20th of the current month." There is no other marriage record to be found; and there is no *record* evidence of any public celebration.

In the record proved, Valentin describes himself as nineteen years of age, and Jeanne describes herself as twenty-one years of age. We have already seen, that under the law of 20th September, 1792, the age of consent was fixed at fifteen for a male and thirteen for a female; and by the same law, the age of majority was fixed at twenty-one for both sexes. Thus, both parties were above the age of consent, and one of them, according to the *acte* of publication, above the age of majority. In the absence of other evidence, the ages stated in the act of publication, would undoubtedly be taken as the correct ages of the parties; but in this instance we see that ages *may* be incorrectly stated, for the age of Jeanne is set down at twenty-one, when, in fact, according to the act of her birth and baptism, she was born 24th November, 1777, and was consequently in her twenty-third year at the period of her marriage. This inaccuracy as to her age, leads us to a careful inquiry into the age of Valentin. It is stated in

the act of publication to be nineteen years, and no record of the *acte* of his birth has as yet been discovered. There being, then, no record evidence of the date of his birth, other proof of his age is competent. In the case of *Broussard* vs. *Mallet et al*, 4 *Cond. La. Rep.*, *N. S.*, 513, the Court say: " Although the register of baptism is higher evidence of the age of a person than proof by witnesses, yet the existence of the former will not be presumed—it must be positively proved that such register does exist. Neither the births, baptisms or deaths are so universally recorded as to enable the Court to ground a legal presumption on the fact of their being so." The Civil Code of Louisiana, being in many respects the same as the Code Napoleon, the foregoing authority is entitled to considerable weight.

We find, by the testimony of Catharine Ferrié, that her brother Valentin was twenty years older than she : he was, therefore, born in 1775, and consequently he was in his twenty-fifth year at the date of his marriage. Again, by the testimony of the Chevalier Daffis, the old friend and comrade of Valentin, we conclude that the period of his birth could not be later than 1779, and consequently he was at least twenty-one years of age at the time of his marriage. Thus, it appears from the testimony, that the husband and wife were both of the age of majority, as well as of the age of consent. But these are not all the facts of the case ; for it is proved that they cohabited together as husband and wife, both before and after the birth of the applicant, and that she went by her husband's name. Daffis says she lived in St. Girons one or two years with Ferrié, and had a child by him ; and again, that Valentin Ferrié was the father of the child. De Galai says she, Jeanne, lived with Ferrié here a long time, at Mr. Benoz' at St. Girons, at the entrance of the city. She went there to be confined. They lived together there. They had an infant named John Pierre, born at Mr. Benoz'. Again she says, Valentin lived with her some time before and some time after the *accouchement*. They lived together at that time as if they were husband and wife. Catharine

Ferrié, although she says her brother was not married at St. Girons, also says, " Valentin quitted the house (his father's) and occupied a chamber with a woman who was a servant next door, *and my father was opposed to this marriage.*" Again she says, " Valentin wished to marry Jeanne; his father did not wish him to marry Jeanne, and would not hear it spoken of, and forbid the children to go and see him after he left the house." There is proof also that she was called by her husband's name. De Galai says, " I have heard her called by the name of Jeanne Ferrié. I have heard Ferrié speak of her by the name of Ferrié." "I have heard people call her Madame Ferrié, many times; the people of the quarter where she lived called her Madame Ferrié." " I have heard Madame Anere call Jeanne Icart by the name of Ferrié, many times, and Mr. Anere call her by that name." And it is in proof, that since she came to this country, Madame Du Lux has admitted that she had been married in France. Creighton testifies : " She thought he (her son) was ungrateful for all the kindness she had done for him, and taking a mother's care of him. She said she had one child when she was quite young; she said *she was married very young,* and this child born about fifteen." Grieser also testifies : " She said, ' I was married in France, too, in the Revolution times.' She said to me, she married very young, and she had the child when she was very young, too." And in her last illness, when the chills of death were creeping over her, and there existed no motive to state other than truth, she said to Madame Grieser that she was married in France in the time of the Revolution, and married to Du Lux in this country. And M. Deguerre, a gentleman of great intelligence, and who proved her faithful friend and adviser from 1807, the period of her arrival in this country, up to the time of her decease, and in whom she confided, took it for granted, from her conversations with him, that she was married in France ; that she frequently spoke to him of the applicant's father, and said her son ·lost his father when he was quite young. These declarations of the deceased, in respect to her

marriage and the applicant's parentage, as well as all her correspondence and other writings, are competent testimony in the cause, as original evidence. (1 *Greenl. on Ev.*, § 104; *The Berkeley Peerage Case*, 4 *Camp.*, 418.) Thus it is shown by the testimony, that there is evidence of the act of the publication of their marriage; of a sincere intention to comply with the forms prescribed by the Revolutionary law, by persons of lawful age; of consummation; of cohabitation; of change of name of the wife; of mutual recognition of the relationship, and of the birth of issue and its recognition. What more can be needed to perfect the evidence of such a contract? What is marriage, but consent to the contract by persons capable in law of giving such consent, and acts consistent with the contract showing its consummation? According to the law of nature, and to all the authorities cited, it is a valid marriage. Suppose that Valentin and his wife, after quitting St. Girons, where the severity of his father had made it uncomfortable for him to remain, had gone directly to New York, leaving their first-born at home with his nurse in the mountains, and had lived together here as husband and wife for years, having other issue—would this court hold such a marriage invalid, or would it hold the applicant to be illegitimate and the other issue legitimate? We think not.

But, suppose it should turn out, that at the date of his marriage, Valentin was really under the age of twenty-one years, how then stands the case? This brings us to an examination of the provisions of the intermediary law of 1792.

By that law it is provided, Tit. IV, Sec. 1. Art. 3, That minors cannot be married without the consent of their father or mother, or relations or neighbors; and by Art. 4, that the consent of the father is sufficient, and if the father be dead, or outlawed, that of the mother.

The other articles of that section are as follows:

*Article* VIII. The relatives and neighbors assembled in the common house of the place where the minor resides, shall deliberate on the subject, before the mayor or other munici-

pal officer, according to the order of the list, in the presence of the procureur of the commune.

*Article* IX. The consent shall be given or refused by the majority of the votes.

*Article* X. No person engaged in the bonds of marriage, can contract a second, until the first shall have been dissolved according to law.

*Article* XI. Marriage is prohibited between relatives, natural and legitimate, in direct line, between those allied by marriage in that line, and between brothers and sisters.

*Article* XII. Those, who are incapable of consent, cannot marry.

*Article* XIII. Marriages contracted against the provisions of the preceding articles, shall be null and of no effect.

The seven articles of the second section of the same title, prescribe the forms of publication of the intention to contract a marriage, and the nine articles of the fourth section prescribe the forms to be observed in the *acte* of marriage.

Thus, it will be seen, that where a prior marriage is existing, or a relationship by blood, marriages are prohibited, as also, between persons incapable of consent, but the twelfth article prohibiting only such as may be contracted between persons *under* the age of consent, necessarily implies, that those contracted between parties *above* that age, are not prohibited. No article of any section of any title of that law attempts to proscribe marriages because the *forms* of the law may not be complied with; and the thirteenth article, which nullifies marriages contracted against the "*provisions*" of the preceding articles," clearly refers to matters of substance and not to matters of form. The forms prescribed are merely directory, and the statute must be liberally construed. This, we have seen to be the law in England, in the United States, and in France. We refer to the cases already cited, and particularly to the cases of *Poutiant* vs. *Poutiant*, *Bertrand* vs. *Delatinne*, and *Barbier's* case. In construing this law, the same principles of justice are invoked in France as in this country,

and the same rules of law apply; and the law, from all the facts and circumstances, will presume, that there was a valid marriage between the parties, and, that, in consequence of the disorder then reigning in the French empire, and the lapse of time, the record evidence of the contract is lost.

But, it is said, there was opposition to the marriage on the part of Valentin's father. If Valentin was twenty-one years of age, the opposition was of no consequence. His father's consent was unnecessary. Let us see the nature and extent of that opposition, in case it should turn out that he was not of age. *Catharine Ferrié* says, his father was opposed to the marriage, chiefly, because Jeanne was a servant; and *Daffis* says, " Valentin Ferrié's father was very much opposed to his son's marriage with Jeanne." This is all the testimony showing opposition on the part of the father, and he alone could make the opposition effectual. But, merely being averse or opposed to the marriage, is not such " opposition" as will become effectual under the law of 1792. All the nine articles of the third section of the fourth title of the law, are devoted to oppositions to the marriages of minors, and to make the opposition effectual, the father must appear before the public officer either personally or by an attorney holding a special power, and he shall there execute his *acte* of opposition in duplicate, both of which shall be signed by the opposing party. It shall state its motives, and be signified at the domicil of the parties and to the public officer, who shall put his *visé* on the original, and a summary mention of opposition shall be made by the public officer on the register of publications. The validity of the opposition is then to be adjudged by the officer within three days, from which judgment an appeal " shall" be taken to the tribunal of the district, and that tribunal shall make a decision within one week, and a copy of the judgments shall be delivered to the public officer. The ninth article provides, that " all opposition offered, *aside from the causes and the forms*, or by other persons than those above designated, shall be regarded as not offered, and the public officer may proceed to the act of marriage; but, in the cases

and the *forms* above specified, he cannot proceed to the prejudice of the opposition, on pain of dismissal from office, of three hundred livres fine, and of all damages incurred." A marked distinction in the phraseology exists between this section and section 1, of the same title, respecting the qualities requisite for one able to contract marriage. In this section, the act of opposition is invalid, unless it conforms to the prescribed *forms*, but in that, the word "forms" is not mentioned.

There must then be evidence of an *acte* of opposition duly signed by the father in duplicate, stating its motives and prosecuted according to the required forms. Was this done? There is no pretence that it was. There is no such record. The law evidently contemplates an authentic act, that is to say, in the language of *Pothier*, an act received by a public officer, with the requisite solemnities (*Trait des Con.* 696.) As this opposition to the marriage of a minor above the age of consent, is an abridgment of natural right and a restraint upon marriage, it ought to be strictly construed, and such seems to have been the intention of the National Assembly; while the statute regulating marriages, should at the same time be liberally construed, because marriage is a beneficial contract.

But, it may be said, that the record of the publication of marriage is defaced, because the word "null" is written in the margin. When it was so defaced, and by whom, does not appear, and will never be known, but we have seen, that the law of 1792 confers no authority upon the keeper of the record to make such an entry, but it requires him, in Art. VIII., after a copy of the judgments of the appellate tribunal shall have been delivered to him, to make mention of them in the margin of the record of opposition on the register of publication. There is therefore no authority in the law for interpolating the word "null" in the record, where it has been placed, and, consequently, it imports nothing. It is of no more import, than would be the falsification of a record by a stranger.

We trust that we have now succeeded in showing, that there was a valid contract of marriage in the year 1800, be-

tween the parents of the applicant, which continued in force until the period of Valentin's death in Spain; that, although, the archives of St. Girons fail to show complete record evidence of the marriage now in existence, the presumption of law is, that the marriage was legal, and the substance of the law of France complied with, and that, the opposition of Balthazar Ferrié, to the marriage of his son, was never prosecuted to effect, but waived and abandoned

III. We now come to the last proposition in the cause, and we claim, that if there were no record evidence of publication of marriage, or testimony, or circumstances tending to prove it, then the case discloses sufficient proof to establish the legitimacy of the applicant.

The third title of the intermediary law, prescribes the manner of recording acts of birth, and the persons by whom the required declarations shall be made, but the law is silent as to acts of baptism, and it is also silent in respect to the mode of proof, whereby the civil *status* of a person may be determined, but this latter defect, has, as we shall see, been remedied by the code Napoleon. There is no record evidence of the act of birth of the applicant, but there is of the act of his baptism. It is in the following words:

*Extract from the Baptismal Record of the Parish of St. Girons, Diocese of Pamiers, (Arriege). Year 1800.*

Balthazar Pierre Ferrié, son of Valentin and of Jeanne Icart, was born and baptized the thirtieth June, eighteen hundred. Godfather, Balthazar Ferrié. Godmother, Rose Ferrié. In proof of this,

BACUE, *Cure of Ledor.*

Objection has been made to this certificate, because the word "legitimate" is not introduced before the word "son," and it is claimed, that therefore this certificate infers illegitimacy. No law of France has been shown, prescribing the form of such a certificate, and no custom establishing such a form has been shown. Nor would it be competent, if such

a custom could be shewn, for no custom can have the force of law, unless it be general, and reasonable, and legal; and it would be absurd, as well as illegal, to establish a custom, whereby, either in consequence of the ignorance or the fraud of the priest or officer, the omission of a single word in a certificate of baptism, should overthrow the birthright of a helpless infant. The presumption of law is in favor of legitimacy, and that presumption cannot be done away with by such an objection to a certificate of baptism. Honesty, not fraud, innocence, not guilt, legitimacy, not illegitimacy, will be presumed. (*Starr* vs. *Peck*, 1 *Hill*, 272; *Wilkinson* vs. *Payne*, 4 *T. R.* 468; 1 *Phill on Ev.* 157; *Harrison* vs. *The Corporation of Southampton*, 21 *Eng. L. & E.* 343.) Had the child been a natural or an illegitimate son, he might have been so described in the certificate, but inasmuch as it describes him as the son of Valentin and Jeanne, it clearly implies, that he is the lawful issue of his parents. (*Clapier* vs. *Banks*, 10 *La. R.*, 63.)

The fact, that the surname of Valentin Ferrié is not mentioned in the certificate, and that the maiden surname of Jeanne, is mentioned, is of no moment, for it is universally the practice in France for married women to retain their maiden surnames, and that practice appears in the case. The legal effect of the certificate of baptism, is, as if it read, "Balthazar Pierre Ferrié, son of Valentin Ferrié, and Jeanne Ferrié, born Icart," &c.

But, we will now turn to the code Napoleon, and ascertain its provisions in respect to the proof of legitimate filiation, for we have seen already, that the intermediary law of 1792, was silent on that subject. The following articles are to be considered:—

*Article* 319. The filiation of legitimate children is proved by the *acte* of birth, inscribed on the public record.

*Article* 320. In default of such record evidence, the constant possession of the *status* of a legitimate child is sufficient.

*Article* 321. This possession of the *status* (*i. e.*, considered as a child born during marriage,) is established by a sufficient

accumulation of facts, indicating the relation of filiation and paternity between an individual and the family to which he claims to belong. The most material of these facts are:—

1. That the individual has always borne the surname of the father from whom he pretends to be born:

2. That the father treated him as his child, and that he provided as such for his education, maintenance, and settlement in life:

3. That he has constantly been acknowledged as such in the world:

4. That he has been acknowledged as such within the family.

*Article* 322. No one can claim a *status* contrary to that which his title by birth, and possession conformable to that title, give to him; and reciprocally, no one can contest the *status* of him who has a possession conformable to his title by birth.

*Article* 323. In default of such record evidence, and the constant possession of the *status* of a legitimate child—or if the child has been registered under a false name, or as born of unknown parents, proof of filiation may be made by witnesses. Nevertheless, this proof can only be admitted when there has been a foundation by written proof, or when presumptions or evidences resulting from facts long continued, are sufficiently strong to determine the admission.

*Article* 324. The foundation of proof by writing, is made from family records; the domestic registers and papers of father or mother; the public, and even private acts emanating from a party engaged in the contestation, or who would have an interest if such person was living.

Under the provisions of these articles, how stands the case? There is no *acte* of the birth of the applicant inscribed on any register, and therefore we must ascertain whether the case furnishes such evidence of the possession of the *status* of legitimate filiation, as is required by articles 320 and 321 of the Code Napoleon.

FERRIE *vs.* THE PUBLIC ADMINISTRATOR.

What are the facts proved? First, there is the fact that the applicant, from the time of his baptism, took the family name of his father, and it must be presumed that his father was present at the baptism, the mother being probably unable to be present. Next, he was baptized by the Christian name of his grandfather, which was also that of his uncle Balthazar, and that either the one or the other was present, and incurred the duty and responsibility of godfather. The applicant, in his examination, says it was his uncle Balthazar, and so says the witness Daffis. Next, the godmother, Mad'e Rose Ferrié, being of the same surname, must be presumed to have been a relative of the family. These facts certainly show the status of legitimacy; for it cannot be supposed that the offspring of crime would be thus treated by the near relatives of either of its parents, or that those relatives would permit such a child to take the family name. Again: the applicant " has always borne the surname of the father from whom he pretends to be born;" and so far as his father could do, during the short period of his subsequent residence at St. Girons, he treated him as his child, and acknowledged him as such. According to De Galai, folio 246, Valentin and Jeanne were present when the child was put to nurse. Daffis says, " the child was called Ferrié, here," and that " the child lived at Balthazar Ferrié's." He could not provide for his maintenance, education and settlement in life, because he did not live to have the opportunity; but it seems, from the testimony of M. Vidal, fol. 220, and of G. V. Ferrié, that the applicant learned the business of a tanner, with his kinsman, Balthazar Ferrié. He has never been known by any other name than Ferrié, either in France or in the United States; and that he has been acknowledged as a member of the family, by his kinsmen, is shown not only by the facts above referred to, but by the testimony of two of his relatives—one of them, G. V. Ferrié, testifying that " my father and the father of the claimant, Ferrié, were *own cousins;*" and the other, Balthazar Ferrié, testifying, " *I am a cousin-german* of John Pierre Ferrié." Thus, if the act of baptism should be deemed insuffi-

cient, or if no such act existed, the applicant has shown all the material facts and circumstances indicated by article 321 of the Code Napoleon; nor is his claim at variance, in any respect, with the status established by the act of baptism, and therefore the evidence does not conflict with the provisions of articles 322, 323 and 324 of the code, but is strictly conformable to them.

Finally, we cannot perceive any legal objection whatever, to the full recognition by this court, of his legitimacy, and, had it not been for the *furor* created among the distant relatives of his mother, residing in France, by the desire of a sudden acquisition of wealth, without the toil and privation necessary to earn and amass it, we do not believe his legitimacy would have ever been questioned. It was easy enough for them, in such circumstances, after the death of Madame Du Lux, to spread abroad the report of his illegitimacy, because in that consisted their only hope of success; and that such must have been the case, is evident from the testimony of some of the witnesses, who state, that they have chiefly heard his legitimacy questioned since the death of his mother.

THE SURROGATE.—The Commissioners appointed to proceed to France, to take further testimony in this cause, having made their report, and the matter having been submitted upon all the proofs, after a very full and elaborate argument, it becomes my duty to pronounce final judgment.

It is proper, in the first place, to examine the facts which appear in the return of the Commissioners. Witnesses were examined at Biert, Massat, and St. Girons. Jeanne Icart was born at Pau, in 1777, and after her father's decease, removed to Biert, her mother's domicil of origin. She remained there until 1796, when she left for Massat; and again, in 1798, she changed her abode to St. Girons.

I. Biert lies south from St. Girons, about sixteen miles, and is a mere hamlet, containing about a hundred souls.

Servat, the first witness examined at this place, seventy-two years of age, stated that he knew Jeanne Icart and her mother; did not know when or where the mother died; was not aware of anything against the reputation of Jeanne, or that she had been married or had a child.

Marie Pagès, sixty-eight years of age, makes about the same statement as the preceding witness, except that she adds: " I have heard that she was married in the neighborhood of Bordeaux, after she left here. . . I have heard that Jeanne had a bastard son. I don't know when it was born. It was at nurse near St. Girons. This I only know by tradition. It was public report, and known by all. I don't know who were the parents of this child. I don't know to whom the infant was attributed. She left this part of the country, and after she was gone a long time from here she returned, as they said, to search for her child. It was not until after her return to this place that I had heard that she had had a child."

Lafitte, seventy-three years of age, testifies, that he knew Jeanne well, and also her mother; that Jeanne left Biert about sixty-three years ago; and afterwards " came back dressed like a lady." He says, " I do not think she was ever married, but I know nothing about it. I never heard any reproach against her reputation while she lived here. I heard that she had had a child. When she returned here, after her absence, she came back to seek a child. I never saw the child, but I heard a report that she had been to America, and had come to look for the child."

Anne Marie Noble, seventy-five years of age, was acquainted with Jeanne and her mother. She states, " the mother died here. I saw her die. I don't know when she died. I was young. I can't recollect when Jeanne lived here. I was young, and slept with her for two months; she was housekeeper. She remained here some time, and then went to live at Massat, at service. She remained here for one month after the death of her mother, and I stayed with her at her mother's house. . . When she resided here she was not mar-

ried. I have heard she had a child. . . Her reputation was good when she lived here. I only heard that she had a child, after she came back from America. . . I saw her when she came back from America. She did not speak of her child. She said nothing as to the cause of her return."

Benoit Carajolle, one of the claimants to the succession, was examined by the Commissioners. I must reject his testimony—with the less regret, however, from the circumstance that he knew nothing of the facts except as gathered by hearsay from his mother, when Jeanne returned from America in 1815, to reclaim Ferrié.

This is the substance of the proof taken at Biert. So far as it goes, it shows that Jeanne had a fair reputation while she remained at home; that she removed to Massat shortly after her mother's death; that no repute of her intercourse or marriage with Valentin Ferrié ever reached Biert, and the birth of her child was not known there, even by rumor, until after her return from the United States.

It must be observed, however, that these witnesses show very little intimacy with the family of Jeanne. None of them were aware that she had brothers, and although Biert is one of the smallest of villages, they were all, except Anne Marie Noble, ignorant that her mother died at that place. It does not appear from this evidence that after her removal from St. Girons, where she formed her connexion with Valentin Ferrié, Jeanne ever returned to Biert until 1815; nor does any report even of her residence at St. Girons, seem to have reached her former home. In this state of general ignorance then, the absence of a special report as to her marriage is not surprising. The major includes the minor. Nothing was known or heard of her; and the basis, therefore, of any particular reputation was wholly wanting. From such a blank of information it would be quite as reasonable to presume she was dead as that she was not married.

II. We will now proceed to Massat, a village four miles from Biert, of about one thousand inhabitants, where this

young woman had a domicil after the decease of her mother. Espagnac, a witness seventy-one years of age, testified that he knew Jeanne as a servant with Espagnac, a notary, and subsequently in the family of Adone, the father-in-law of the witness. He says, " she lived here very modestly, and led a virtuous life," and " had no intimate relationship with the young men of the village." He never heard of her being married, nor until lately, that she had had a child. Adone, sixty-six years of age, states that Jeanne came from Biert, and lived at his father's house one or two years, and then went to St. Girons. He says, "just before coming to live at my father's house as a servant, she gave birth to the child in the neighborhood of St. Girons. The child was born about two years before coming to our house to live, during which time the child was at nurse. The fact of her having had a child was known to my family at the time she was a servant at my father's. The reputed father of this child was one Espagnac. . . After she left Massat, she returned to it twenty years afterwards, and lived at my father's house for a month, not as a servant, but as a guest and acquaintance. . . She went to the environs of St. Girons to find her child, and had it brought to our house, where I saw it. She stated to the family that 'twas her child. . . She stated to us on her return that she was married in the United States, and that her husband himself had sent her to get this child, because they themselves had none. She said that her husband knew that this child was hers. I do not remember what name this child passed by. At the time of her return the child was nine or ten years old. Her general reputation was light. . . I never knew her to call the child in question anything but her son." Jeanne Lescoulie, eighty-two years of age, deposed that she knew Jeanne Icart about sixty years ago, when living at Espagnac's. She says: " She was about the same age as myself, and was a comrade of mine when I was a girl. . . Her general reputation was that of a gallant, loose girl. . . I knew Jean Espagnac; he was not married; his father sent Jeanne away from the house, because he discovered relations

of intimacy existing between them. I knew Jeanne was gallant at that time, because she was the same age as myself, and gave me her confidences." Magdelaine Benazet, seventy-two years of age, was acquainted with Jeanne sixty years since. She testifies, "She was my friend. . . During the time she was at Massat she lived in no other family but M. Espagnac's. I knew her well all the time she lived at Massat, from her first arrival here.... Her character during the time that I knew her, and while in this part of the country, was always good, and that of a modest girl. I know that her reputation in Massat and the neighboring village was irreproachable. I knew Jean Espagnac formerly. I do not know of any *liaison* between him and Jeanne, and never heard of any such rumor." Rogale, seventy years of age, states his acquaintance with Jeanne, and then says: "Her character was good. I never heard anything against her reputation. I have heard it said she had had a child. I don't know what became of that child." None of these witnesses ever heard of the decedent's marriage or cohabitation with Ferrié; but there could not have been any repute of that connexion when she was living at Massat, because her residence there, 1796–8, preceded her intimacy with Ferrié from two to four years. And as to subsequent repute, no information in respect to her abode at St. Girons appears to have reached Massat, and consequently there was no basis for a particular reputation. Nor had any of these witnesses ever heard until recently that Jeanne had given birth to a child— except Adone. He tells a strange story, to the effect, that she had a child two years before coming to live at his father's house, by Jean Espagnac, in the neighborhood of St. Girons; and Jeanne Lescoulie says there was some intimacy between Jeanne Icart and Jean Espagnac. Lescoulie is related to one of the French claimants to the succession. The tale is. refuted, however, upon the face of Adone's own testimony, for he distinctly says, "she came from Biert to reside with us, and remained with us one or two years. She left for St.. Girons at the termination of that period." . All the

proofs agree with this—that she came directly from Biert to Massat, and in 1798 went to St. Girons. The child was born in 1800, and yet Adone would have it born in 1794, at St. Girons, when she was living with her mother at Biert. But Adone was only nine years old in 1798, and his brother-in-law Espagnac, who was then fourteen, and lived in the same house with him, never heard the rumor, but on the contrary, gives Jeanne an excellent character. Magdalaine Benazet knew Jean Espagnac; Daffis was well acquainted with Espagnac, the father; but neither of them heard of this pretended intimacy. Adone is strangely contradictory on another point. The child, he says, was born about two years before Jeanne came to Massat, say in 1794; she remained there one or two years, then left, and returned twenty years afterward, and the boy was then nine or ten years old. No dependence is to be placed upon a witness so ignorant or careless. Upon the whole, then, the clear preponderance of testimony is in favor of Jeanne's good character while residing at Massat.

III. The proofs taken at St. Girons require a more critical examination, as we here approach the theatre of the events upon which the elucidation of the case intimately depends. To judge properly the bearing of this testimony, it is necessary to keep in mind a few dates. In 1798, Jeanne went to St. Girons, and entered the family of M. Anere, as a domestic. Her son was born in 1800. She subsequently went to Bordeaux and formed an intimacy with Henri Du Lux, came to the United States in 1806, and did not return to France until 1815, when she sought out her son, and placed him with Anere, at St. Girons, to be educated. With these landmarks in view, we shall be able to see in some measure how far the witnesses speak from knowledge or from hearsay.

In the house immediately adjoining that of M. Anere at St. Girons, where Jeanne was domesticated, lived Balthazar Ferrié, a tanner. His son Valentin became attached to Jeanne, their love was mutual, they yielded to its impulses,

and became the parents of the child,· who now, after the lapse of fifty-six years, claims the succession to his mother's estate. ·

Gerons Victor Ferrié, whose father was cousin to Valentin, was born in 1813, and yet he speaks very freely of events that occurred before he was born, and says, that Jeanne "lived at M. Anere's as a servant; . . I know that she had a child by a person named Ferrié; . . I knew the applicant Ferrié when he lived as a ·servant with Anere (1816–1821), when he first went there 'twas as a servant." The witness was only three years old when Ferrié was placed with Anere, and eight when he went to Bordeaux.. As to tradition, he says, "I have always heard that he was illegitimate. It was my father who told me that Jeanne Icart had had a child by a person named Ferrié. . . I cannot recollect any one who told me he was illegitimate except my father. It is principally since the death of his mother, that I have heard it said that he was illegitimate."

Vidal, born in 1805, testified as follows:—"I remember Jeanne Icart. I think I saw her in my youth at M. Anere's. I never knew her parents. I don't recollect how long since Jeanne Icart lived here. I only remember her when she left St. Girons. She lived no where else but at M. Anere's to my knowledge. She lived at M. Anere's as a servant." Now Jeanne arrived in New York in 1806, and there is no proof that she ever returned to St. Girons between 1804 and 1815; and the period at which she was living with Anere "as a servant," was before this witness was born. Vidal claims to have been an intimate friend of Ferrié, mentions the place he was put to nurse from "general report," and also says "his supposed mother was Jeanne Icart, and his supposed father was Valentin Ferrié. I never heard of any report of marriage between the parents. .. I have heard he was a natural son of Jeanne Icart. I heard it from all the world; it was the report at this place, before he left here for Bordeaux. I can't remember any one who told me so." Pauline Bigourdan, born in 1805, testifies, that she made the acquaintance

of Jeanne when she came to hunt up Ferrié in 1815. The witness was niece of Anere, and frequently saw Ferrié at his house. She says, "I heard that the child was illegitimate. I heard it when she came to seek the child. I heard that this woman, who had been a servant here, had had a child, and had come to take it away. I can't remember any one who told me so. I have heard my uncle speak of the child as illegitimate. I have heard my aunt speak of the child as illegitimate."

Daffis, seventy years of age, deposed that he knew Jeanne Icart; "she lived here at St. Girons, opposite to me, at M. Anere's, a couple of years or so—I don't know how long exactly—she was a servant there. I don't know that she was ever married to any one named Ferrié or to any one else. She lived here with a man named Ferrié; I cannot recollect exactly how long, but was one or two years, I think. She had a child by him. It was born and baptized at St. Girons. I don't recollect when it was born; I don't know in what house it was born. . . She bore the name of Jeanne Icart during her residence here. Valentin Ferrié was the father of the child. I say he was the father because he and Jeanne kept company together. Valentin Ferrié was born here. He was six years older than I was. I knew him well; he was a tanner by trade. I don't know whether he was married to Jeanne Icart. He did not live with Jeanne Icart as her husband at the time I knew them. His father was opposed to his marriage with Jeanne. He stole leather from his father to provide money for Jeanne. He died in Spain—was assassinated. He went to Spain to carry on his trade, in 1808–9–10. . . I knew him all the time till he left for Spain. We were associates and tanners together. As to John P. Ferrié, I don't know when he was born, but I believe it was between 1800 and 1802. When his mother was about to be delivered, she left M. Anere's house to give birth to the child. I knew that she left M. Anere's for that purpose, because I was then opposite neighbor, and on inquiring for Jeanne, I was told she had gone next door to be delivered, and

the next day I inquired, and was told she had had a boy. Some of the neighbors told me she had gone next door, and it was the neighbors told me she had had a boy. I don't know whether he was placed at nurse or where. The child lived at Balthazar Ferrié's. . . The child was called Ferrié here. . . I don't know whether there was any reputation of the marriage of his parents. . . I don't know whether the child was legitimate or illegitimate. The general report was 'twas a natural child. The father of the child never spoke to me of his relations towards the child. He never told me that he was married to Jeanne Icart, or that he was not married to her. He never said anything to me about it. I can say from my own knowledge that she was the '*bonne amie*' of Ferrié, whether she was his wife or not, I do not know. My reason for saying that she was his '*bonne amie*' was because when she went to Biert, Valentin Ferrié accompanied her. I have no other reason than that for saying so. . . I knew Jeanne Icart all the time she lived at Anere's, and Ferrié during the same period. . . After I left St. Girons I never saw Ferrié or Jeanne. . . Ferrié was a respectable young man, industrious, and a good worker. I never knew that he had had any children, or intimate relation with any other woman than Jeanne Icart. Jeanne had no relation with any other man than Valentin Ferrié. I never heard anything against her reputation with reference to other men here. Valentin Ferrié's father alluded to her as his son's '*bonne amie.*' . . The position of Ferrié's family was much better than Jeanne's. Valentin Ferrié's father was very much opposed to his son's marriage with Jeanne. The position of Ferrié's family was very comfortable. I never heard of any thing said of a proposed marriage between Jeanne Icart and Valentin Ferrié." Margot Labat De Galai, about eighty years of age, deposed that she knew Jeanne Icart, and her mother when she came to see Jeanne at Anere's. "I never knew her father. I don't know when or where her mother died. I cannot say when Jeanne Icart lived here. She lived at M. Anere's, I don't know for how long a time. She was servant there. I don't

know that she was ever married to John P. Ferrié or any other person. She lived with Ferrié here a long time at M. Benoz', at St. Girons, at the entrance of the city. She went there to be confined. They lived together there. She cohabited with him there. They had an infant named John Pierre. The child was born at M. Benoz'. The infant was baptized at St. Giron's. I don't know when she left here. The only name she bore was Jeanne Icart. The father of this infant which was born of Jeanne Icart was Valentin Ferrié. I don't know the name of the mother of Valentin. His father's name was Alexis. Valentin was born and resided at St. Girons. He was a tanner. I don't know if he was married to Jeanne Icart. I don't know that he cohabited with her as husband. Valentin lived with her some time before and some time after the accouchement. They lived together at that time as if they were husband and wife. I don't recollect precisely, but it was over two months. . . I know the child of Jeanne Icart. He was born at the house of M. Benoz. The child was sent to nurse. I don't know how long the child stayed at nurse, but it was sent on the morning after the birth, and Jeanne made the bargain and paid the nurse. I don't know in whose name the child was sent, as they, Valentin and Jeanne, were both together when it was sent. . . The parents were Jeanne Icart and Valentin Ferrié. I understood they wished to be married; whether they were married or not I don't know. He only passed as her son at St. Girons. He saw Jeanne Icart often. He was treated by her as a kind mother. The child of Jeanne Icart, I don't know if it was legitimate or not. I don't know if they passed as husband and wife or as lovers. I never heard of a marriage existing between them. I came to Jeanne Icart immediately after the accouchement, and found Ferrié there with the midwife. I was there a moment after the accouchement. The midwife was named Pujuquet. The midwife is dead. I remained there an hour or an hour and a half. I visited Jeanne Icart often. I don't know who paid the costs of the accouchement, whether it was Ferrié or Jeanne, as they were

both there together. I heard Jeanne Icart speak often of Ferrié. I can't remember if she called Ferrié her husband or her lover. I have heard her called by the name of Jeanne Ferrié. I have heard Ferrié speak of her by the name of Ferrié. I knew Jeanne Icart after that, two or three months. I don't know how long after that, before Ferrié left here. I recollect very well that they both went to see the child at nurse; and they went to Bordeaux together. I don't know if they returned or not. I have heard people call her Madame Ferrié many times. I don't know if they were married or not. I was a companion and intimate friend of Jeanne. The people of the quarter in which she lived called her Madame Ferrié. I don't know how old I was when that accouchement took place. I was employed by Madame Anere to take things to Jeanne Icart; that is the reason I was there at the time of her accouchement. I am not yet eighty years old, but pretty near it. When Madame Anere sent me with things to Jeanne Icart, she told me to take these things to Jeanne Icart's. I have heard Madame Anere call Jeanne Icart by the name of Ferrié many times, and M. Anere called her by that name. Ferrié never called Jeanne Icart to me by the name of Ferrié, because he always spoke of her to me as Jeanne. I don't know if Valentin Ferrié ever addressed Jeanne Icart by the name of Ferrié. I never stayed there to hear their conversation. I don't know, if when Ferrié spoke of Jeanne Icart, he spoke of her as his wife, or his *bonne amie* or as Madame Ferrié."

Balthazar Ferrié, forty-six years of age, a cousin of the claimant, and son of Alexis, Valentin's brother, could, of course, only speak of reputation. He was but six years old when Jeanne returned to St. Girons, in 1815; and although he says she called Ferrié "her son," he also deposes, "I can't remember when Jeanne Icart left St. Girons. I can't say whether she ever returned." He was about twelve years old when Ferrié went to Bordeaux. He states that Ferrié's supposed parents were Valentin Ferrié and Jeanne Icart, and that "the child was reputed illegitimate."

Catharine Ferrié, the sister of Valentin the claimant's father, sixty years of age, testified that Valentin was twenty years older than herself. She says "Valentin remained at St. Girons a long time, and then left for Spain. I don't know if he was married to Jeanne Icart. I don't know if he ever associated with Jeanne Icart as husband and wife. He was killed on the road between Spain and France, coming with a cart. He was killed by brigands on the road." She was ignorant of "the time and circumstances" of Ferrié's birth; whether "he was placed at nurse, if he was baptized, who were his reputed parents, or anything about him," but says she is sure Valentin was not married, "because Valentin quitted the house and occupied a chamber with a woman who was a servant next door, and my father was opposed to this marriage. This Jeanne during this time was the *bonne amie* of my brother Valentin. My family recognized her as the *bonne amie* and not as the wife of my brother, and were opposed to that. I resided at St. Girons during the whole time my brother was connected with this woman. I have said they disappeared together about the same time. I can't say precisely when. I can't say when my brother left St. Girons, I was so young then. I don't know where he went then. I don't know if he went to Spain, or where he went. I have not heard of my brother having a son. He had a child by Jeanne, which died young, I have heard it said. My reason for saying the child died was because I heard so. I cannot recollect any one who told me. The child was not recognized at all, as it died right away. . . After Valentin left his father's house he never returned to it again to live. His father refused to hold any relations with him. Valentin wished to marry Jeanne. His father did not wish him to marry Jeanne, and his father would not hear it spoken of, and forbid the children to go to see him after he left the house. Valentin wished to marry her before he left the house. I was too young for him to talk to me about it, but it was well known in the family and discussed. Valentin worked at his occupation with his father, but after his flight from the

house he worked with him no longer. He worked with some of his brothers, who were of the same trade and had tanneries. I know of no other objection that his father had to the marriage, than that she was a servant. On that account the family were opposed to it. Valentin's character was very good. He was not a dissipated, wild young man. I never knew or heard of his having any connection with any other woman than Jeanne. He was industrious and steady. I don't know if he provided Jeanne with money. Jeanne had a good reputation. I never heard it said or knew of her having any intimate relations, or being connected with any other man than my brother Valentin. I never heard her called anything but Jeanne." This witness stated that she was married forty years ago, and it must have been " ten years or thereabouts," before her marriage, that Valentin and Jeanne disappeared. " She disappeared first, and at the end of some days he disappeared." Ribat, sixty years of age, knew Valentin Ferrié, and says " I cannot recollect distinctly when he died. I think they told me 'twas in 1811." He states that he last saw Valentin in December, 1811, at the city of Bayonne. " He came to Bayonne for goods, to take into Spain. I left there for Toulouse; he left for Spain. I left St. Girons in 1809 to go to Spain. Valentin Ferrié had left more than two years before me."

IV. This completes substantially the parol testimony taken under the commission. A large portion of it is entirely unimportant, and as to the remainder, it is manifestly unsafe to rely upon many parts relating to material points. From fifty to sixty years have passed since the occurrence of the events, in respect to which the memory of these witnesses has been invoked. But few of the acquaintances of the parties have been found living. Suppose a marriage consummated fifty-six years ago, between a young artisan, and a poor domestic, each dependent for their livelihood upon the labor of their hands, without the means of establishing a home, and compelled by their poverty to live separately and

to place their offspring in the charge of strangers. Let these events occur in a city of over five thousand souls, and how could it be expected after this lapse of time to find any distinct traces of the habit and repute of the parents as husband and wife. The period of their intercourse was brief; they soon disappeared from the scene; there was nothing remarkable in the circumstances to attract attention and impress the mind; the father and mother of Valentin are dead; the family in which Jeanne lived, are dead; and most of those who have been called upon to throw light on the transaction were either casual acquaintances, or were of such tender age at the time as would exclude them from the sphere of reliable testimony. A certain degree of dependence may be placed upon the recollection of young persons, and it lies in the experience of every one to remember some events of very early childhood, which stand out along the course of our remotest reminiscences, like luminous points. Conceding this to the fullest extent, it is obvious that in respect to matters of no special interest, having no domestic connection, and which relate rather to repute and hearsay than to actual occurrences, it is very dangerous to depend upon the testimony of persons quite young at the time, and now after an interval of some fifty or sixty years, to determine important rights upon evidence of conversations where slight variations from accuracy would materially affect the issue.

But let us examine the proofs more closely, and in doing this distinguish between evidence of facts—reputation at the time of Ferrié's birth—and reputation subsequent to 1815, when he was living with Anere. There are but four witnesses who speak as to contemporaneous facts and repute, Daffis, De Galai, Ribat and Catharine Ferrié. Of the others one witness was born in 1813, two in 1805, and one in 1809. Ribat does not appear to know anything about the case, except that he last saw Valentin Ferrié in 1811. The evidence then is narrowed down to three; Daffis an acquaintance of the Ferriés, De Galai, an attendant on Jeanne at the accouchement, and Catharine, a sister of Valentin. Daffis

was then from 13 to 15 years old, and he says Valentin was six years his senior. Though they were associates together, Valentin never spoke to him of his relations towards the child or its mother,—whether Jeanne was Valentin's wife or not he does not know, but he says she was his "*bonne amie.*" If by this term he intends to indicate an illicit connection, the reason he gives for it is insufficient; "my reason for saying that she was his *bonne amie,* was because when she went to Biert, Valentin Ferrié accompanied her." He heard nothing from Valentin on the subject. He learned from Valentin's father, however, that the young man stole leather to provide Jeanne with money, and says he spoke of her as his son's "*bonne amie,*" and was very much opposed to their "marriage." This is the sum of Daffis' information at the time as derived from the parties. Giving the words "*bonne amie*" their worst signification, there is nothing in this evidence inconsistent with the marriage in 1800, for no doubt before that period Jeanne and Valentin had unlawful intercourse, and to give any materiality therefore to the declarations of the father on this point they must appear to have been made after the date of the alleged marriage. Daffis, it is true, states that Valentin did not live with Jeanne as her husband, but then again he says she lived with Ferrié one or two years, that Valentin never spoke to him on the subject, and whether Jeanne was his wife or not he does not know. He understood the child was born in the next house to Anere's, but does not know whose house it was—though he lived opposite. At one stage of his examination he says that Jeanne left for Bordeaux and he knew Valentin till he went to Spain, and at another he says, "after I left St. Girons I never saw Ferrié or Jeanne." He stated also that there was a Balthazar Ferrié living at St. Girons who was the godfather of the child, and when the supposed sponsor was produced, it turned out that he was born in 1809.

Catharine Ferrié, the sister of Valentin, was born in 1795, and was only five years old when Ferrié was born. It hardly seems worth while to discuss the evidence she has given, for,

from the nature of the case, it can only consist of impressions derived from an early period of childhood. No doubt some dependence is to be placed upon the general tenor of these impressions, and in the main they agree with the facts otherwise indicated, but it would be unwise to lay much stress upon them at this distance of time. As a guard against confidence in the accuracy of such family traditions, we are confronted with the assertion by this witness, that " the child died young," " right away," a species of proof which would disprove Ferrié's existence as well as his legitimacy.

If we pass now to De Galai, we find quite as much room for criticism. She says she knew Jeanne's mother when she came to see her at Anere's, and yet the mother was buried three or four years before. She states that Valentin's father's name was Alexis, instead of Balthazar; and that Ferrié's mother visited him at Anere's after he was brought back from nurse, whereas she was never at Anere's with the child, unless on her way to Bordeaux, after she had found him in the Pyrenees.

It is obvious to my mind after a careful examination of the evidence, that the witnesses, including the three now under review, mingle in a greater or less degree information derived from hearsay, or from facts developed in this country before the commission was issued, with their own knowledge and recollections. It is difficult, if not impossible, to distinguish between these sources, and the greatest caution is necessary therefore in judging of their testimony. Still there are certain leading and prominent facts in regard to which it would be unreasonable to make question. Here was a young and attractive if not beautiful woman, of good reputation, living in an adjacent house, as a domestic: Valentin Ferrié forms an attachment for her which is reciprocated: his parents frown upon the affair, but as one of the witnesses expresses it " there was a wall between them—that is all"—and their intercourse was continued. They desired to marry, the father was opposed to it, and Valentin left his home and occupied an apartment with Jeanne. Before their child was born

bans of the proposed marriage were published. The child was placed at nurse, and about a year afterwards Jeanne leaves St. Girons. Catharine, the sister of Valentin says, "he occupied a chamber with a woman who was servant next door, and my father was opposed to the marriage." De Galai says, "Valentin lived with her some time before and some time after the accouchement; they lived together at that time as if they were husband and wife; I don't recollect precisely, but it was over two months," and Daffis states "she lived here with a man named Ferrié, I cannot recollect exactly how long, but it was one or two years I think." These in substance are about all the facts of consequence elicited, excluding mere hearsay and repute.

That for a time this couple were consorting together without the sanction of the matrimonial celebration is undoubted, that they were anxious to remove this blot is equally clear, and there can be no question that at one period Valentin's father was opposed to the match. Daffis states that he does not know whether there was any reputation of the marriage, but the general report was that the child was illegitimate. He mentions no person who told him so, and though professing considerable intimacy with Valentin, admits that he never spoke to him concerning his relations to the child or its mother. It is somewhat remarkable, had much intimacy existed between them, that he does not refer to the bans of marriage published before the birth of the child. I have already noted several errors in his testimony and am inclined not to place much stress upon his assertion of a "general report" fifty-six years ago, which is not traced to the friends, or the family, or the acquaintances of the parties. Catharine Ferrié who was only five years old at the time, says she never heard any thing as to the legitimacy of the child, and she understood it had "died right away." She denies the marriage, and on this point she possibly expresses the belief of Ferrié's family. De Galai is ignorant of the marriage, but she expresses no contrary reputation. She states, however, that the people of the quarter in which Jeanne lived, called

her Madame Ferrié, and she heard M. and Mde. Anere call her by the same name. It is difficult upon such a state of facts to say that the evidence on the subject of repute is satisfactory either for or against the marriage.

Passing over the intermediate period down to 1815, when Jeanne again appeared and as Madame Du Lux reclaimed Ferrié as her son, we find fresh statements on the subject of reputation. She then publicly recognized the child and declared that her husband knew it was hers. She assumed the duties of maternity, and the boy was placed with her old master Anere, under the family name of his father. Under all the circumstances attending this strange and singular case, it is not surprising that a rumor should have arisen as to his illegitimacy. His mother made no secret of the relationship, but still her desertion both of father and child, and her subsequent connection with M. Du Lux would naturally have originated suspicions unfavorable to her fair fame. This is not a kind of repute which possesses much force. There are only two witnesses who profess to have received information on this point from parties who were living at the time Ferrié was born—Victor Ferrié and Pauline Bigourdan. The former says his father told him Ferrié was illegitimate, and the latter that she heard a similar statement from M. and Mde. Anere; but I am not clear upon the face of the testimony whether these witnesses meant to state that any thing more was communicated, than that Jeanne when she lived at St. Girons, " had had a child by a person named Ferrié." Pauline Bigourdan was from ten to sixteen, and Victor Ferrié from two to eight years old, when Ferrié the claimant was living at St. Girons.

V. With these facts before us, let us next proceed to the consideration of the documentary evidence, and to the determination of the legal principles by which all the proofs are to be tested in their judicial weight and estimate.

A question of marriage and legitimacy is always deeply interesting, leading to the investigation of the most tender and intimate intercourse of life, laying bare the secrets of the

heart, unveiling domestic privacy, and involving relations which lie at the very basis of natural and social right. It concerns our common humanity, for there is no class or condition beyond the reach of occurrences which may call for judicial determination upon the claims of husband, and wife, and children; and there should always therefore be the most grave and considerate care, that in deciding the particular case in view, the mind should be kept as free as possible from specialties, and incline rather to such broad and catholic rules as are adapted to all classes and all cases, from being founded upon the fundamental principles of our nature, and a just view of the constitution of civil society, the rights of its members, and their mutual happiness and well-being.

Before proceeding to the examination of these rules I would observe that there is no conflict in this cause, among children claiming under different marriages. There are cases in which the contest has been between the fruits of a previous marriage, kept secret, and the offspring of a subsequent ceremonial marriage. But it is not so here; there are no dormant rights to establish against other children; no hard claims to set up against innocent parties standing in the same relation towards the deceased; but the question is whether Jeanne Icart's son shall succeed to her estate, or whether it shall pass to remote collaterals.

It is an established maxim that the presumption is always in favor of marriage. *Semper præsumitur pro matrimonio.* (*Steadman* vs. *Powell*, 1 *Add. R.*, 58.) There are certain legal rules in relation to presumptive evidence, which are approved by reason, sound policy, the common sense of mankind, and for the honor of jurisprudence, I may add, charity. They are not accidental rules, but have their basis laid broad and deep in the immutable principles of morality and equity, and their observance is largely conducive to the order, happiness, and welfare of society. There are also degrees in the weight or force of different presumptions; and here again the law is not so cold, nor so regardless of humanity, as to reject with stoicism the claims of charity and the appeals of help-

less orphanage.   Some presumptions are especially favored, and among them may be classed the presumption of innocence, and that all things have been rightly done.   For example, the mere cohabitation of two persons of different sexes, without any proof one way or the other to characterize the connection, affords an inference of marriage, the preference being given in favor of the moral rather than the immoral nature of the intercourse.   (*Taylor* vs. *Taylor*, 2 *Lee*, 274.)   So likewise where the evidence shows filiation, simply, without indicating the *status*, legitimacy will generally be presumed, the implication of law being that the intercourse to which the birth of the child must be referred was lawful.   (*Best on Presumptions*, *p.* 57, 58 ; *Hubback on Successions*, *p.* 248, 250.) These presumptions may of course be rebutted, but in this respect there exists a distinction as to the degree of evidence required to repel particular classes of presumptions.   The benevolence of the law is nowhere exhibited more abundantly than in favor of marriage and legitimacy.   If there are conflicting claims of marriage, they may so neutralize each other, as to prevent any application of the rule, but otherwise the legal presumption may be resorted to, and its force becomes greatly increased by the remoteness of the affair which forms the subject of inquiry.   It is manifest that when the transaction is recent, the parties are living and the evidences are all at hand, it is wiser to be governed and guided by the light which may thus be afforded, than to trust to mere inference.   But where from the antiquity of the event, and the death of the parties, we cannot feel any degree of confidence that the proofs are complete ; when from the imperfection of the human memory it becomes dangerous to rely upon testimony of ancient occurrences ; and when by accident the clue to an elucidation of the whole truth may have been lost ; then presumptions come in with great and controlling force, and impel the investigator, groping as it were in the dark, to seize hold upon those favorable conclusions which the law draws for the protection of man.   This view cannot be more conveniently illustrated than by the case of *Piers* vs. *Piers*, in

the House of Lords. (*H. L. C.*, 331.) Two persons who had long been living in concubinage were desirous of marriage, in expectation of the birth of a child; and a marriage was alleged to have been celebrated in form by a clergyman, but no license was shown nor any entry found in the Marriage Register. The bishop deposed that he had never granted a license; six years subsequently the parties performed another nuptial ceremony, in the certificate of which the wife was described by her maiden name; a child born after the first and before the second marriage was baptized as the child of the wife by her maiden name; and still the House of Lords held that so strong was the presumption in favor of marriage, that it was not rebutted by these circumstances. The principle established in this case was that the question of the validity of a marriage cannot be tried like any question of fact which is independent of presumption, for the reason that the law presumes strongly in favor of marriage, particularly after the lapse of a great length of time. The court seemed to adopt the doctrine laid down by Lord Lyndhurst in *Morris* vs. *Davies*, 5 *Cl. & Fin.*, 163, that " the presumption of law is not lightly to be repelled; it is not to be broken in upon or shaken by a mere balance of probability; the evidence for the purpose of repelling it must be strong, distinct, satisfactory and conclusive." Or as Lord Cottenham stated the proposition, " A presumption of this sort in favor of a marriage, can only be negatived by disproving every reasonable possibility,"—" you should negative every reasonable possibility." The particular case to which this principle was applied in *Piers* vs. *Piers*, involved only a question of form, the evidence of the marriage itself being deemed satisfactory, but still the same rule may be laid down, though perhaps not so strongly, in favor of the presumption of the marriage contract itself. For example, in *Fenton* vs. *Reed*, 4 *John. R.*, 52, the Supreme Court of this State held that when parties had married during the life time of the wife's first husband and continued to cohabit after his death, though the marriage at its inception was void, yet after the death of

the first husband a new contract might be inferred from coha-bitation and reputation. In *Starr* vs. *Peck*, 1 *Hill*, 270, a child born ten days before a marriage ceremony between its parents, was declared to be legitimate. There was no evi-dence of previous cohabitation as husband and wife, though it was probable the parties had agreed to be married. The court refused to disturb the verdict of the jury, saying, "we are to presume against a notorious act of immorality almost as strongly as we would against the commission of a legal crime."

The presumption thus charitably entertained by the law in favor of marriage operates with the greatest force when children alone are interested. In such cases it has not been customary in the ecclesiastical courts of England to require such strict proof as would be demanded were the parents living. (*Taylor* vs. *Taylor*, 1 *Lee's Cas.*, 571; *Lady Mayo* vs. *Brown*, 1 *Lee*, 271.) The children at least are innocent, if there has been any irregularity. They have not the same means of knowledge which were possessed by the parties in chief; objections which the parents might readily have an-swered, suspicious and mysterious circumstances which they possibly could have cleared up and explained, the children may be utterly unable to solve or elucidate, and the same inferences ought not to be drawn from their failure to do so, as might with propriety be deduced against the parents. "It is certain," says Sir William Scott, "that the illegitimacy of a child may be proved by probable evidence, perhaps by reputation only, but then the reputation must be clear and undoubted, it must be uniform, for if a reputation has existed both ways, the conclusion would be in favor of the marriage." And again, "the law is at all times very unwilling to bastardize children." (*Fielder* vs. *Fielder*, 2 *Hagg. C. R.*, 195.) The ques-tion of marriage, remarks that distinguished Civilian, d'Agues-seau, "should be examined in a different manner, when it con-cerns the validity of the engagement between the contracting parties themselves, and when it concerns the *status* of their children. After death has broken the bond of union, less

rigorous attention is paid to formalities, in order to pronounce in favor of possession, the most sure and inviolable law, when the matter relates to the *status* of parties." This same principle pervades the French jurisprudence, down to the time of the adoption of the Code Napoleon, in which an express provision was incorporated, requiring a less strict line of proof in respect to children when the parents are deceased, than in cases where they are living. (*Art.* 194, 197, *Toullier*, *l.* 1 *tit.* 5, § 608.)

VI. It should not be forgotten, however, that the marriage now under consideration must be tested as to its validity by the French law existing at the time ; and though I cannot hope to make such an investigation with the learning and ability it would receive, were the case before a French tribunal, nevertheless it becomes my duty not to shrink from the effort. It will be seen that the same broad and enlightened principles pervade the jurisprudence of France, which characterize the common law of other civilized nations, on the subject of marriage—the line of judicial thought is similar, and the streams of justice flow in the same channels. There is little if anything peculiar or exceptional, and this parallelism, which vindicates so admirably the reason of the law as a science, aids the student in his explorations and search after the truth.

The essence of the marriage contract consists in consent. Nature places it upon this pure and simple foundation. Words and forms are only the external indications of this agreement, and are not requisites to its validity. The ceremony may be expedient and becoming, but adds nothing to the intrinsic sanctity and force of the obligation. Before man it may increase its apparent solemnity, but in the sight of God, the vital power of the institution resides in the mutual covenant singly. It consists in " the present consent, whereby the parties accept each other as husband and wife, whether by words expressed, or tacitly by marital cohabitation or acknowledgment." (*Stair's Inst.*, *L.* 1., *Tit.* 4, § 6.) Beyond this, whatever is required by legislation, has the force

only of a positive civil regulation. The proof of the existence of the marriage, however, depends largely upon the forms required by the local law. Among the Romans, marriage could be contracted without any public formalities, by the mere agreement of the parties, and its proof therefore was drawn from exterior signs. Cohabitation as husband and wife was the ordinary evidence invoked for its judicial establishment. By the Canon law, which was the basis of the ancient general law of Christendom on this subject, consent alone was of the essence of the contract, and this has been the rule in every civilized and Christian community, except as modified by positive regulation. The public solemnity, even when prescribed, was only matter of order; and irregular marriages, including promises to marry, if followed by enjoyment of the privileges of marriage, were sustained as valid contracts. (*Dalrymple* vs. *Dalrymple*, 2 *Hagg. C. R.*, 54.) The Canon law, consequently, for a long time authorized the presumption of marriage from cohabitation, until the Council of Trent prescribed the presence of a priest and three witnesses, and the preservation of registers of marriage in all the parishes. This was only an ecclesiastical regulation, but it was confirmed in France by the ordinance of Blois, in 1579; and when that law went into execution, about the year 1600, marriage was no longer presumed merely from cohabitation, where the parties were living, and could point to the time and place of celebration. Still there was no rule limiting the establishment of the marriage to evidence from the register, or prohibiting absolutely a resort to testimonial proof. On the contrary, the ordinance of 1667 expressly permitted testimonial proof, when it was shown that the registers had been destroyed, or had never been kept; and in respect to children, whose parents were deceased, it was eventually settled by a series of decisions, whose authority never was shaken, that there was no necessity of proving the actual celebration of the marriage, whether by the register or otherwise, provided the fact could be reasonably established by other testimony. This exception in favor of children was founded in

reason and humanity, for it were hard to visit upon the off-spring the taint of bastardy, for ignorance of a fact which occurred before their birth. Thus the law stood, until by the edict of Louis XVI. in 1787, the Constitution of 1791, and the act of the National Assembly in 1792, marriage was again recognized merely as a civil contract, the necessity of religious solemnities was dispensed with, and although certain public forms were prescribed, they were not made essential to the validity of the contract, except in enumerated cases. (*Toullier*, *L.* 1., *Tit. V.*, § 501.) The *Code Civil* closed finally the legislation on this subject, and introduced into the statute law provisions regulating the mode of proof, which anterior to that time had been left, untrammeled by positive precepts, to the discretion of the tribunals, under the application of such principles as were approved by justice and sound reason. Even under the Code, however, the children of deceased parents are not put to strict proof of a ceremonial marriage by the production of the register, but when their parents have lived together as man and wife, they may show their legitimacy by proof of their *status*, if it be uncontradicted by the *acte* of birth. In such case there is a presumption of law that the parents were legally united and the children are ignorant of the place of their marriage. (*Duranton, L.* 1, *Tit.* 7, § 109, 110, *Code, Art.* 197.) Although it has been thought that the article of the Code on this point was merely a statutory recognition of the common law previously prevailing, the candid mind must be satisfied, upon an examination of the decisions, that since the Code there is a greater degree of rigor exacted in the production of testimonial proof, than was required before. Ferrié was not, however, born under the dominion of the Code, and it is more just to illustrate his case by the ancient jurisprudence, than by laws enacted after his *status* was determined. The most famous of the decisions exhibiting the old law as to the proof of legitimacy, by children whose parents are dead, is one in which the celebrated Cochin was conspicuous, whose argument is quoted by the French jurists, as containing the principles upon which it was

determined. The children of Barthélemi Bourgelat, son of Pierre Bourgelat and an Italian woman, made a claim of succession to the estate of their grandfather Pierre, and the question was whether Pierre had been lawfully married, and Barthélemi was his legitimate son. No *acte* of marriage was produced, nor was it indicated where the rite had been performed, although the place where the parties had first met and subsequently lived, was proved. It appeared that the mother of Barthélemi had, whilst *enceinte*, submitted to be taken towards a lying-in hospital for unchaste females, without any resistance until the last moment, when she declared she was married, and exhibited a paper in Italian, which the officer having her in charge supposed to be a marriage contract, and he dismissed her home. It was also shown that Pierre Bourgelat, the father, had settled upon his son Barthélemi a pension, calling him in the settlement " *mon fils naturel*," and the latter had accepted the grant, styling the donor " *père naturel*," and acknowledging " *une entière connaissance de ma naissance et de mon état*," an entire knowledge of his birth and *status*. These writings had been confirmed repeatedly by acquittances for the pension during a great number of years. Against all these grave facts the claimants had only Barthélemi's *acte* of baptism, and the testament of his mother, which gave to his father the title of husband. Notwithstanding, he was declared legitimate, and a decree was pronounced in 1729, in favor of the claimants. This judgment, says Merlin, " is one of those which have most contributed to strengthen the inviolable rampart of all legitimate children, deprived of the *acte* of celebration of marriage of their parents, against the rapacity of collaterals." Nor does it stand alone. There are various other cases in the French courts sustaining legitimacy, on the *acte* of birth and possession of the *status*, without proof of the celebration of the marriage of the parents ; for example, the *arrêts* in the matter of Potier, by the Parliament of Paris, in 1772 ; Robin, in the year 12, by the Court of Paris, affirmed by the Court of Cassation, in 1806 ; and Thiériot, decided in the Court of Appeal of Grenoble, in 1807. (*Merlin, tit. Légitimité, Sect.* 1, § 2.)

The inscription of an infant on the register with the quality of legitimate, is without doubt on the part of the father and mother an important fact, contributing to form the possession of the *status* of marriage, but it cannot form it alone. (*Merlin, ibid.*) Other circumstances are requisite, and here it is, the distinction lies between the ancient jurisprudence and the provisions of the Code. Formerly the determination as to the nature and character of the proof to show marriage, was reposed in the judgment of the tribunals; under the Code this discretion is limited by an express provision, requiring evidence that the parents lived publicly together as man and wife. (*Art.* 194, 197.) The consequence has been that several decisions have been rendered under the Code, applying its regulations in regard to the proof, to marriages contracted before; and on the other hand, there are conflicting cases, where this retrospective effect has not been given, but the law existing at the time of the marriage has been applied. (*Merlin, Tit. Légitimité, Sect.* 1, § 2., *Quest.* vii.) From the investigation I have been able to make, it seems to me that the special circumstances of each particular case have affected more or less the inclination of the court to the modern and more rigorous, or to the ancient and more liberal rule. No doubt exists that under the Code the *acte* of birth only proves filiation and not legitimacy. (*Toullier, L.* 1., *Tit.* 7, § 846, 851.) but still there are decisions where very little more than the *acte* of birth has been received as proof of the marriage of the parents.

VII. It is very clear, then, that to prove legitimacy under the laws of France, the child is not put to ceremonial proof, and is exempted from producing the *acte* of marriage of his parents. But still the records of St. Girons have been examined, and the failure to find there any *acte* of marriage is urged against the legitimacy of Ferrié. It is entirely sufficient to answer that the law does not demand such proof. There are some circumstances, however, which are deserving of notice in this connection.

It is certified that a fire occurred on the night of 5th–6th Nivose in the year seven, the 25th–26th of December, 1798, which destroyed the public records of the *Etat Civil* of the Commune of St. Girons. In one of the certificates the date of the fire is said to be " in the year seven or the year eight;" and it is also stated that no records exist in the registry office further back than the year eleven. Another certificate declares " that the registers containing the acts of the civil state from the year 1770 up to 1800, or at least to 1799, were burned at a fire which happened in December, 1798." These statements are carelessly made, but still the fact appears that no records of an earlier date than the year eleven, commencing in September, 1802, exist in the archives of the District of St. Girons. Of course there could be no *acte* of marriage applicable to Jeanne Icart and Valentin Ferrié, and no *acte* of birth applicable to the claimant, before the year eleven, and so it is certified. Some records however appear to have been preserved at the Mayoralty, and among them *actes* of baptism in 1790 and 1791, and *actes* of birth, *actes* of marriage, and publications of marriage, from the year seven. From these records no *acte* of marriage between Valentin Ferrié and Jeanne Icart has been produced, nor the *acte* of birth of Ferrié, the claimant, although it is not certified that a search has been made for the latter.

On the fourth of May, 1800, the following notice of publication appears to have been entered in the register of the Mayoralty of St. Girons. " This day, the fourteenth Floréal, the year eight of the French Republic, I, the Municipal Agent of the Commune St. Girons, have published aloud by word of mouth, before the outer and principal door of the Municipal Hall of St. Girons, in execution of the law of the twentieth of September, seventeen hundred and ninety-two, old style, that Valentin Ferrié, nineteen years of age, son of Balthazar Ferrié, and of Frances Cazes, tanner, resident of St. Girons, and Jeanne Icart, twenty-one years of age, daughter of Jean Icart and Magdalene Rivière, native of Massat, resident of St. Girons, intend to execute the *acte* of their marriage on

the twentieth of the current month, at ten o'clock in the morning, before the President of the Municipal Administration of the Canton of St. Girons: and I have caused this present publication to be posted up by copy before the door." On the margin of this record the word "*neant*" was written, apparently as ancient as the body of the instrument, and a cross was drawn over the face of the *acte*. None of the *actes* in the book were signed.

Was this *acte* of publication annulled by proper authority in consequence of the refusal of the father of Valentin to consent to his marriage? The law of 1792 required *actes* of publication to be signed by the public officer. None of the *actes* contained in this volume of records were so signed. When marriage was opposed by the parties whose consent was required, there should have been an *acte* of opposition signed by the opponent, and " a summary mention of opposition made by the public officer on the register of publications;" and when the validity of the opposition was determined, the officer was required to note the judgment " in the margin of the record of opposition on the register of publication." The act also declares that all opposition aside from the cases and forms designated " shall be regarded as not offered, and the public officer may proceed to the *acte* of marriage." It seems obvious therefore that if the word "*neant*" written on the margin of the *acte* of publication in question was designed as a record on the ground of parental opposition, the provisions of the law were not complied with. The records themselves are irregular from wanting the signature of the officer, and the *acte* of nullification, if founded on opposition, was irregular, from not noting the opposition and the judgment. Nor are there any searches produced for the *actes* of opposition or the judgments thereupon, so as to afford the means of seeing whether the publication was annulled on that ground. We have nothing more than an ancient record crossed, and the word "null" written in the margin, without knowing when, by what authority or under what circumstances this was done. We do know, however, that it was not annulled in legal form.

But it is said no *acte* of marriage has been found. True, but the records are not indefectible. The Code Napoleon (*Art.* 46, *Toullier, liv.* 1, *tit.* V., § 599, 884,) provides for the contingency of the destruction of registers, and in such event admits parol proof of marriage and birth; and it has been decided that the provision relates to partial mutilations. The following case illustrates this point. After the decease of Jacques Saboués, Françoise Sanade claimed to be his wife by a marriage contracted in the year 1809, before the Mayor of the Commune of Renung, and the claim was contested by the father of the deceased. On examining the registers, the *actes* of publication and celebration could not be found. It appeared subsequently that Saboués during a severe illness had been married privately, that on being restored to health, he was fearful his marriage would be declared null for defect of the consent of his father, and during the absence of the secretary of the municipality had entered his office, extracted the leaves of the register relating to the marriage, and altered the marginal paging—which mutilation he afterwards confessed. The court decreed that the marriage could be proved otherwise than by production of the *acte*, and that it was not invalid because it had not been celebrated publicly. (*Duranton, Cours de droit Français, Liv.* 1, *Tit.* 5, § 249.) This instance shows that the mutilation of the records is quite supposable, and it suggests a motive which might have existed in respect to the records of Ferrié's marriage. There is also the case of Jeanne Marie Caniven whose marriage with Jean Antoine Rivayran, in 1793, was celebrated before the curate of Castres, and also before the civil officer of the Commune, but the latter had omitted to inscribe the marriage upon the public register. The fact was proved by five witnesses, and the marriage was confirmed by the Royal Court of Toulouse. This was under the law of 1792, and in the same quarter of France where the claimant was born. Of course, the mutilation of documents will not be presumed, but there certainly should have been such an examination of these records of marriage as would have removed the possibility of doubt as to

their integrity. At this distance of time we are ignorant of the manner in which the registers were originally made up, and it does not follow inevitably, that if the act of marriage was performed, it was recorded, or the record kept. In the case of *Piers* vs. *Piers*, in the House of Lords, a marriage by license was presumed, though the bishop testified no license had been granted, and there was no entry in the registry of marriages. In the present case we have proof of the baptism of the claimant Ferrié, and although the law was just as imperative in respect to *actes* of birth as to *actes* of marriage, no *acte* of birth is produced. And yet we cannot doubt the birth and the baptism. Duranton says, " The declaration of the birth of an infant may have been neglected to have been made. In disregard of the law it may have been written upon a loose leaf, which has been lost or torn out. It is possible also that in consequence of invasion, civil troubles, or contagion, no registers have been kept, or that by some accident those which have existed are lost or that the *acte* of birth has been suppressed by fraud. In all these cases the infant deprived of title will not nevertheless be despoiled of his *status*. If contested, he can prove it by the possession in which he has lived." (*Liv.* 1, *Tit.* 7, § 127.) These hypotheses may be indulged as well in regard to the *acte* of marriage as to the *acte* of birth. From some cause unknown we have not the latter; is it too violent a presumption to attribute the absence of the *acte* of marriage to a like cause ? That under the new system introduced at the Revolution there should have been irregularities by the public officers, is quite probable, especially in the country, and it was not till the year twelve, that the Minister of the Interior addressed forms of the *actes* to the various functionaries in order to prevent these irregularities. (*Duranton, Liv.* 1, *Tit.* 2., § 290.) The records at St. Girons have been subjected to one of the calamities foreseen by the *Code Civil.* The fire which occurred in the year seven, destroyed the larger portion of the registers. The records of the Mayoralty from that time are existing, but for some reason unexplained, those of the Tribunal of the First Instance do not reach further back than the beginning of the year eleven;

so that the means do not exist of correcting any possible error or irregularity in those remaining at the Mayoralty. I conclude then upon this branch of the case, from the existence of actual irregularities, such as the default of the officer in not signing the *actes* of publication, and the loose, unattested and unexplained act of the nullification of the bans; from the absence of the *acte* of birth, and from the destruction of the records which might have led to detection of defects in the registers of the Mayoralty, that it is not impossible that there may have been a public act of celebration of marriage. It is true the presumption of law favors the rule that all things have been rightly done—but the presumption for marriage is so much stronger that, as in the case of *Piers* vs. *Piers*, the silence of the register is not enough to prevail against it.

If it be said that there is no proof of the publication of the bans—supposing for the moment that the bans produced in evidence were properly annulled—I answer that this provision of the law was merely directory, and an omission to comply with it is not ground of nullity. Even under the *Code Civil* marriages not contracted in the *Maison Commune*, nor before the proper officer, nor on previous publication of the bans, are not void, though they may be attacked and annulled for irregularity. (*Art.* 191, 192, *Duranton, Liv.* 2, *Tit.* 5, § 333, 334, 335, *L.* 1, *Tit.* 5, § 124.) The single question therefore in all this class of cases is, whether the marriage was contracted before a priest or civil officer—a failure in which respect is the only ground of nullity. Prior to the act of 1792, the marriage might be shown by testimonial proof, when it could not be otherwise established. If the *acte* itself could not be produced, and circumstances excused the omission, it was allowable to have recourse to evidence of a different nature. There was no special rule prescribed by the law of 1792, and as that law, in relation to the ceremony, merely substituted the civil officer in place of the priest, the principles of evidence previously existing, in the absence of any new rule, were not changed. (*Merlin, Mariage, Sect. IV.*, § 1, *Art.* 1, *Quest.* § 2; *Sect.* 5, § 1.) It was accordingly decided

in the case of Barbier, that a marriage celebrated in June, 1798, but not inscribed on any public register, was not void, but other proofs might be invoked to show its celebration. (*Journal du Palais, XI., p.* 177.) So also in the case of Lanefranque, where the marriage was celebrated at the house of the bride's father, the *acte* was inscribed upon a loose sheet of paper and afterwards transferred to the register, the Court of Cassation held, that under the law of 1792, the marriage was not void in default of solemnization at the *Maison Commune* or for want of inscription upon the stamped register; and this ruling was placed on the ground that the law of 1792 had not attached the pain of nullity to the provisions requiring these forms. (2 *Journal du Palais, p.* 717.) In *Bertrand* vs. *Delatinne,* the marriage was contested for want of the previous publications demanded by the act of 1792, but was held valid. (2 *Journal du Palais,* 476.)

VIII. It is thus satisfactorily established that, to sustain his legitimacy, Ferrié is not compelled to prove a ceremonial marriage by the production of the *acte,* nor to show that the formalities of previous publication were performed.

But it is urged that Valentin Ferrié was a minor, and the consent of his father was indispensable to the validity of the marriage. The bans published on the fourth of May, 1800, .recite that Valentin was nineteen years of age, and Jeanne Icart twenty-one. The latter was, in fact, then twenty-three, and a similar mistake as to the former would have placed him at the legal age. The *acte* of his birth has not been produced, and there is no certainty as to his age. Daffis says he was six years older than himself, and that would have made him twenty-one. His sister Catharine states that he was twenty years older than herself, which would make him twenty-five in 1800. Can we be entirely safe and positive against this evidence, and on the faith of the bans, declare that he was not of age. But it is said that his father was opposed to the marriage. When? Doubtless at the commencement of their intimacy, but whether his opposition was con-

tinued when a child was about to be born, or was indicated in the formal manner the law required, who can say?

There is a fact in connection with Ferrié's *acte* of baptism which is not unworthy of notice in this connection. Two of the Ferrié family appeared as godfather and godmother. The child was named Balthazar Ferrié, the same name as his grandfather, and the godfather was Balthazar Ferrié. This act was in itself a declaration of legitimacy, and was attested as such by those who assisted at the ceremony. In a similar case, Sir William Scott remarked on the conduct of a witness who deposed against the existence of a marriage. "He had himself attested the legitimacy of the child by a solemn act in the house of God—that of being godfather to her," and as "the daughter of Thomas and Mary Nelson." (*Fielder* vs. *Fielder*, 2 *Hagg. C. R.*, 196.) Now who was the Balthazar Ferrié who assisted at this baptismal ceremony? Was it the child's grandfather? The claimant, Ferrié, says his uncle was his godfather, but he is evidently mistaken, his uncles being named Peter and Alexis. Daffis states, "There is a Balthazar Ferrié here, who was the godfather of the child," but when that Balthazar Ferrié was produced, he proved to be the son of Alexis Ferrié, and to have been born in 1809. A witness was examined named Victor Ferrié, who testified that his father and Valentin Ferrié were cousins german, and it is possible that his father was named Balthazar. But this is mere conjecture. If the godfather who assisted at the ceremony was the father of Valentin Ferrié, the fact would be proof not only of consent, but also of the legitimacy of the child. In the case of Barbier, already cited, the grandfather had assisted at the *acte* of birth of his son's child, and the court held that he by this had recognized and approved of the marriage."

But upon this point I think the law is with the claimant, Ferrié, even if Valentin was under age, and his father was opposed to the marriage.

The consent of parents to the marriage of minors, though by the ecclesiastical practice a requisite to the formal

celebration, was not required by the Canon law as *essential* to the formation of the contract, nor was it demanded by the regulations established at the Council of Trent. (*Merlin Empêchemens de Mariage, Sect. 5, Art. 2.*) " Nothing can be more clear," says Sir William Scott, " than that by the universal matrimonial law of Europe before the Reformation, the consent of parents was not required *de necessitate* to the validity of the contract." (*Horner* vs. *Liddiard*, 1 *Hagg. C. R.*, 352. *See Fielder* vs. *Fielder*, 2. *Hagg. C. R.* 194.) By the ancient jurisprudence of France, want of parental consent was only cause of relative nullity and not absolute, and therefore it could be proposed only by the parents, whose authority had been offended. (*Merlin, Tit. Bigamie, No.* 2.) The same rule continued to be applied to marriages contracted under the law of September, 1792, which governs the *status* of Ferrié. This is illustrated by the case of Barbier, indicted for bigamy, who pleaded the invalidity of his first marriage, which took place in June, 1798, for the reason that it had not received the consent of his father. The plea was overruled, on proof of subsequent approbation on the part of the parent. (*Journal du Palais*, xi., *p.* 177.) The consent of parents, however appropriate and convenient it may be deemed, is in point of form and strict right, the mere creature of positive enactment,—a restriction upon marriage, superadded to the requisites of natural law—a limitation imposed by the civil authority beyond the demands of social and natural obligation. It is therefore to be construed strictly. (*Hodgkinson* vs. *Welkie*, 1 *Hagg. C. R.*, 262.) In applying a similar provision in the English marriage act, the courts have generally acted upon this principle. The language of that statute explicitly declares that the marriage shall not be valid, without the consent *first had and obtained*, and yet the leaning in favor of marriage is so strong that subsequent acquiescence has been taken as proof of consent. (*Osborn* vs. *Goldham*, 1 *Phill.*, 298 ; *Selby* vs. *Selby*, *ibid*, 299.) The decisions have gone the length of presuming consent, where the courtship was known and not forbidden, and

of requiring the negative of consent to be proved in the plainest terms. (*Smith* vs. *Huson*, 1 *Phill.* 296 ; *Balfour* vs. *Carpenter*, 1 *Phill.*, 221.) The *onus probandi* lies on the party assailing the marriage, " who must prove clearly not only the minority but also the want of the requisite consent." (*Days* vs. *Jarvis*, 2 *Hagg. C. R.*, 173 ; *Hodgkinson* vs. *Welkie*, *ubi sup.* ; *Stoney* vs. *Terry*, 1 *Phill.*, 298.) In one of the cases cited, the language was, " the court presumes consent, unless dissent is proved ;" and in another it is said, " the party who prays the sentence of nullity must prove the fact of the marriage having been had without the consent of the father. The presumption of the law is in favor of the marriage. *Semper præsumitur pro matrimonio.* Where a marriage has been solemnized, the law strongly presumes that all the legal requisites have been complied with. Consent is presumed until the contrary is shown." Under the *Code Civil* the father is not receivable to attack the marriage for want of consent, if it was approved tacitly, or if a year has been allowed to pass without objection, after notice. Nor can the minor avail himself of the irregularity, when he has permitted a year to elapse posterior to his majority without reclamation. (*Art.* 183, *Duranton, Liv.* 1, *Tit.* 5, §§ 124, 285, 297, 302, 303.) The principle of waiver is very justly applied in these cases, and the marriage is valid *ab initio*, where there has been an actual or constructive waiver, or default in reclamation within the proper period. Cohabitation, after the minor has come of age, beyond the year, and tacit approbation on the part of the parents, close the door against reclamation, and cure the previous irregularity. A year passed after knowledge, without parental objection, constitutes tacit approbation. Silence, in the judgment of the law, is a witness of assent. (*Toullier Liv.* 1., *Tit.* 5, § 619 ; *Duranton, ubi sup.*) To prevent the ceremony, parental dissent must be exhibited by an *acte* of opposition, in default of which the marriage stands good until annulled. (*Merlin, Empêchemens de Mariage, Sect.* 5, *Art.* 2, § 1.) Want of consent being an impediment only by positive regulation, is simply prohibitive

and not ground of nullity. It does not *ipso facto* detract from the validity of the contract, but in order to have the marriage vacated, the party whose consent was requisite, or the minor, must demand judicial interposition. The contract in such cases is not void, but only voidable at the instance of the person whose consent was required, or of the minor interested. Now in the present instance, if Valentin Ferrié was under twenty-one years of age, he was still beyond all question far beyond the age of legal consent, and had in judgment of law the legal capacity to form a matrimonial engagement, and his marriage cannot be annulled at this remote period by parol proof of dissatisfaction and opposition on the part of his parent. In other words, as the authorities show, minority and opposition are not of themselves sufficient ground of nullity, in case of failure to invoke judicial interposition.

IX. The case, then, is narrowed down to the single question, stripped of all technicalities, and all formal requirements of law, whether upon the whole evidence there is sufficient ground for declaring the claimant Ferrié illegitimate.

It is clear that his parents were anxious a marriage should be celebrated. Jeanne was then *enceinte*, and the natural desire of her heart must have been to legitimatize the child, and diminish her shame. Her previous conduct had been good, her intercourse with Valentin was still subsisting, he had attached her affections, and was still the object of her love. On his part he had exhibited his ardor and constancy by clinging to her in spite of all obstacles, he had forsaken his parents and his home rather than forsake her. He was no profligate libertine, but for aught that appears, this was the first and single engagement of his heart. The publication of the bans shortly before the birth of the child leaves no doubt that these young people had agreed to be married, and were desirous of consummating the agreement with the forms of a public ceremonial. There is a case which occurred in the year four of the Republic, showing the deductions which under such circumstances may be drawn merely from a con-

tract to marry. Poutiant received into his service Margue-
rite Guy, who became *enceinte*. Two months before her
accouchement a contract of marriage was made between her
and Poutiant. There was no *acte* evidencing the celebration
of the marriage upon the register, but the *actes* of birth of
two of her children styled Marguerite the wife of Poutiant,
and she was buried with the same title. It thus appeared that
after connection, the parties had agreed to espouse each other,
but there was no proof that this had been followed by public
celebration. The legitimacy of the children being contested,
after the decease of their parents, it was held, under the
*Code Civil*, that the contract of marriage, and the *actes* of
birth, and of the burial of the mother were sufficient evidence
of the legitimacy of the children. (*Poutiant, c., Poutiant*, 8
*Journal du Palais*, 293.) This is a decision in point. In Fer-
rié's case there was a contract of marriage, evinced in the
public proclamation of intention, but, as in the matter of
Poutiant, there is no *acte* of marriage on the register. The
silence of the register does not positively prove there was no
marriage at St. Girons, any more than the absence of Fer-
rié's *acte* of birth proves he was not born at St. Girons. And
granting even that the proposed ceremony was prevented at
the Commune, is it impossible that the rite may have been
performed elsewhere, by another functionary and at another
time—irregularly perhaps, but still performed.*

Now let us look at the *status* of the child. The *Code Civil*
indicates the nature of the facts which tend to establish the
*status* of legitimacy, but it does not demand absolutely the
concurrence of all of them, rather leaving it to the judgment
of the tribunals to determine how far they shall be conjunc-
tively required. "It is apparent," says Duranton, "that the

---

* As the French law then stood, even if the marriage had been subsequent
to the birth, Ferrié would have been legitimate. Natural children were legiti-
mated by the marriage of their parents, so that the stain of their birth was effaced,
without any vestige remaining, and the offspring were equalled in every respect
to children born in wedlock. (*Toullier, Liv* 1, *Tit.* 7, § 922; *Merlin, Légitima-
tion, Sect.* 2, § 2, 3, *Id.*; *Bâtard, Sect.* 1, § 1.)

same character of proof cannot be demanded in every case—for example, with regard to a child who has lost his parents at an early age, who does not know his name and is not yet received into society, . . in the facts constituting possession in such a case, the courts should demand less." (*Liv.* 1, *Tit.* 7, § 132.) The *status* is determined by name, reputation, and treatment—*nomen, fama, et tractatus.*

As to treatment when he was of tender age, Ferrié's case is one demanding the broadest charity of the law. His parents were in humble circumstances, and probably unable to sustain an establishment however moderate. It became necessary for the child to be sent to nurse, and the mother to resume her labors as a domestic. There was no home where the character of their mutual relations could be exhibited to the world. Prevented by the necessities of their condition from constant living together, an essential element of habit and repute was wanting. But still so long as the parents continued to live at St. Girons, the persons with whom the child had been placed would demand compensation for its nurture, and there is no reason to suppose that Valentin failed in this obligation. And as to Jeanne, certain it is that as soon as she could hear of the death of Valentin, and was no longer in danger of being called to account for her connection with Du Lux, she made an earnest effort to resume her long neglected maternal duties. The new evidence obtained by the Commission justifies me in correcting an opinion expressed in my previous judgment, as to the desertion of this child. There is not only no proof showing desertion on the part of the father, but as he continued to reside at St. Girons, at various intervals, nearly to the time of his death, and was doubtless known to the child's foster-parents, the fair presumption is that he was not permitted to neglect his paternal duty, even if he had the inclination. Under the circumstances, therefore, there could not have been, from the nature of the case, any proof at St. Girons, of the *status* of the child, other than his *acte* of baptism; and as to the place of his

nurture, until discovered by his mother and brought to St. Girons, there does not appear any clue to guide our investigations. The last that was seen or heard of Valentin Ferrié was at Bayonne, in December, 1811, and he was shortly afterwards killed by brigands whilst crossing the Pyrenees. As soon as the news could reach her, the mother institutes inquiries for the recovery of her child, and when they eventuate unsuccessfully, herself crosses the ocean, proceeds to the scene of her early life, discovers and recognizes her son, and from that period assumes the offices of maternity. Why then should we presume that Valentin Ferrié failed to recognize and provide for his son, up to the time of his decease? How can we affirm that he did not call him by his own name, nor recognize his *status* as legitimate?

The reputation of being illegitimate, which some of the witnesses declare attended Ferrié at St. Girons, after he was placed with Anère, in 1815, might have existed without knowledge, and as a species of that gossip which attends unusual or mysterious circumstances connected with the social position of young people. His father was dead, his mother bore another name, and he had been left since his birth among strangers. Jeanne suddenly appears as a fine lady, and though assuming his charge and acknowledging him as her son, remains reserved perhaps in regard to the events of her early and obscure life.

There is one circumstance, however, in regard to which there is no doubt, and which stands out prominently through all Ferrié's history. He has always borne his father's name. This is one of the most important tests of his *status*. The name of the father is a constant, enduring declaration to society and the world, of the child's lawful origin. It is given to him at his entrance into life, when the parent's heart is most widely open to the claims of his helpless offspring, —it accompanies him ever after, proclaiming the paternal recognition. The bastard is *nullius filius*—the child who bears his father's name from the baptismal font and retains it,

without contradiction, is presumptively *patris filius*, and has a strong presumptive claim to legitimacy.

And here we approach a fact, which, in my judgment, so aids, supports, and corroborates the various arguments in favor of Ferrié's legitimacy, as to overcome all opposing conjectures, and determine the balance of probability against them. His mother, as already appears, declared him to be her son. From the evidence of De Galai there can be no doubt that his father recognized him as his son; and from his baptismal certificate, now for the first time produced, it is certain he bore his father's name just after his birth. This recognition on the part of both his parents, standing alone, and in the absence of sufficient proof to show his bastardy, is enough to establish his legitimacy—that is to say, from an admission of paternity or maternity, without qualification, the law implies legitimacy.

X. As to the effect of a simple declaration of filiation, one of the earliest instances is that contained in the 117th novel of Justinian, which declared that whosoever having a son or daughter by a free woman, with whom marriage could exist, should state in writing by a public officer, or subscribed by his own hand, or in the presence of three witnesses, or by his testament, or in public acts, the fact of filiation, *hunc aut hanc filium suum esse aut filiam*, and should not add that they were natural, *et non adjecerit naturalem*, they were to be esteemed legitimate, no other proof should be demanded of them, and they should enjoy all the rights of legitimate children, *hujusmodi filios esse legitimos et nullam probationem ab iis quœri, sed omni frui eos jure quod legitimis filiis nostrœ conferunt leges.*

This principle of recognition is thus stated by Mornac. (*Merlin Légitimité, Sect.* 1, § 2.) *Satis est ut quis nominetur filius et publice agnoscatur, passimque habeatur et credatur apud omnes.* The reason of the rule consists in the unwillingness of the law to indulge in other than charitable presumptions, its readiness to protect the rights of children, and yield them the

*status* the parents have assigned, and its interpretation of the acts of mankind in harmony with common understanding and usage. When a person declares another to be his son, legitimacy is implied. Upon that basis all the affairs of the world and all social intercourse are conducted.

Ferrié was baptized the same day he was born.

The following is the extract from the baptismal records of the parish of St. Girons :—

YEAR 1800.

" Balthazar Pierre Ferrié, son of Valentin and of Jeanne Icart, was born and baptized the thirtieth of June, eighteen hundred. Godfather, Balthazar Ferrié. Godmother, Rose Ferrié. In proof of this—Baque, Cure of Ledor. Signed on the record."

Besides the publication of the bans, this is the only record handed down to us throwing light upon the events we are now struggling to elucidate. What inferences are fairly to be deduced from it? The baptismal record, if the parents were privy to it, and certainly that would be the ordinary presumption, is evidence that the parties acknowledged the child to be theirs. Under all the circumstances in this case, there can be no doubt on that point. (*Wood* vs. *Wood*, 2 *Curteis*, 516 ; *Mayo* vs. *Brown*, 2 *Lee*, 391.) But does it prove anything more? I am aware that it has been held under the *Code Civil*, that the *acte* of birth is evidence only of filiation and not of legitimacy, but it must be remembered that the Code prescribes the rules of proof in this class of cases, and has the force of a statutory regulation, which the courts are not at liberty to vary. Evidence, however, is not governed by foreign law ; its weight and admissibility depend upon the *lex fori*, the law of the forum in which justice is administered. Besides, the effect to be given to this *acte* of baptism must be controlled, if we are to regard the French law at all in this connection, rather by the value of the *acte* at the time of its inscription than by artificial rules subsequently adopted.

What then were the worth, force and effect of such an *acte* as this, when the claimant Ferrié was carried to the baptismal font, and what was the construction which would then have been given to its terms, according to contemporaneous usage and judicial interpretation? These may safely be our guides in establishing the presumptions to be derived from it.

All the authorities, ancient and modern, concur in ascribing to such an *acte* as this, proof of filiation. That point is clear, and from the fact that Ferrié was the son of Jeanne Icart, we are thus promoted another step, and find that he was the son of Valentin Ferrié. Does the record afford any presumption of legitimacy?

It is observable that this certificate of baptism represents the mother of the child by her maiden name, Jeanne Icart. That, however, is a common occurrence in, if not the usual form of, *actes* of baptism. The records returned by the Commission, as well as numerous cases in the French courts, show this very satisfactorily. Even in England, where the custom is quite uniform as to the wife bearing her husband's name, a similar certificate of baptism, representing the mother by her family name, long after an alleged marriage, has not been esteemed as impeaching the legitimacy of the child. (*Piers* vs. *Piers, ubi sup.*)

The next criticism upon the terms of this certificate relates to its failure to represent the parents as married, or the child as legitimate. The answer is that if such terms had been contained in the certificate, the proof of legitimacy would not in point of form, have been strengthened a particle. Such terms are mere surplusage; the law does not demand them. Their presence or absence is a matter of indifference, and affords no ground of presumption or inference for or against legitimacy. The article of the *Code Civil* on this subject (*Art.* 57,) supposes that the infant is legitimate, and hence requires the name of the father as well as of the mother to be stated. To name the parents is all the requisite substance of the *acte* of birth of a *legitimate* child. The law requires nothing more, and of course permits no presumption to arise from the absence of what it

does not require. Consequently, if the child be not described as legitimate, no suspicion attaches; and if it be described as legitimate, the presumption in favor of the child is in no degree strengthened. (*Duranton, L.* 1. *Tit.* 7, § 108, 116; *Tit.* 2, § 305, 308.) This principle has been judicially asserted in the case of Gabriel Huret, who declared in the *acte* of birth of his daughter, that she was the child of himself and Elizabeth Royer, *his lawful wife*, when the latter was only his concubine. (*An* xii., *Sirey tome* iv., *part* 2, *p.* 44.) But the *Code Civil* was adopted subsequently to the birth of Ferrié, and it is necessary, therefore, to see what was the anterior rule existing. By the law of 1792, the *acte* of birth was required to contain the day, hour and place of birth, the designation of the sex of the infant, its Christian name, the Christian name and surname of the father and mother, their profession and domicil. Nothing is there said of the legitimacy of the child, and anything on that head in the *acte* would of course be surplusage. But in the case of Ferrié, we have not the *acte* of birth, and of necessity are compelled to have recourse to the baptismal certificate. In this respect, however, I shall show that the same rules apply.

Merlin places among the proofs which are ordinarily advanced of the possession of a legitimate *status*, the *acte* of baptism, which he says with almost all Christian people holds without contradiction the first rank. This is certainly a strong statement and from high authority. Cochin announces this principle in the following emphatic manner :—*C'est par ces registres qu'on fait son entrée dans le monde.* " It is by these registers one makes his *entrée* into the world. The law wills that one should give entire faith to these registers as depositories of the *status* of men." If we are to give them entire faith, let us examine the law which governed their inscription. The ordinances issued to regulate *actes* of baptism were those of 1539, 1667, and 1736. The first directed the register to contain the time and the hour of nativity; the second, the day of the birth, the names of the child, the father and mother, godfather and godmother; the third, which was

the work of the Chancellor d'Aguesseau, added various formalities. But none of these laws demanded the necessity of giving to the child his quality of legitimacy or illegitimacy, and the absence of a form not required could not, therefore, create any presumption against the subject of the *acte*. Still it may be said that usage supplies such a presumption. To this may be replied the language of Merlin: "We know that there is commonly added to the names of infants the quality of legitimate children; but this usage which should only be regarded as a *superfluous precaution*, cannot make an *acte* not legal which wants this quality. No person has a right to add to the dispositions of the law, much less to erect into legal obligations usages purely facultative. It is sufficient that our ordinances have not prescribed the insertion in baptismal *actes* of the word *légitime*, so that the omission of this word does not attaint the legitimacy of children." He then mentions several qualifications of illegitimacy, and states that when these are absent, and the *acte* contains " the names of the child, the father, mother, godfather, and godmother, *it imports necessarily and by force of law a presumption of legitimacy.*" A few cases will illustrate this position. Isaac Combes had been baptized under the name of "*fils d'Etienne de Combes, et d'Elisabeth Puch,*" the word *légitime* being omitted. He did not allege any *acte* of celebration of marriage of his parents, but the Parliament of Toulouse, in 1753, sustained his legal *status*. Pierre Dufour was baptized as "*fils de Guillaume, et de Judith de Negrier.*" It was not said that the parents were married, nor that the child was legitimate, and the father was not present at the baptism. Nevertheless, by a decree of the Parliament of Paris in 1782, it was adjudged that Pierre Dufour was legitimate. Thérèse Perrin was baptized as " *Thérèse Perrin, fille de François, et de Marguerite Espagnet.*" The certificate did not state that she was legitimate or that her parents were married. She was taken from the baptismal font to the house of Antoine Laugier, and was educated and maintained by him. By the will of Laugier and by her own contract and *acte* of marriage

she was described in the same manner as in the *acte* of baptism. There was consequently no possession of her by father or mother. After Laugier's death her legitimacy was contested, and she was alleged to have been his daughter by an illicit commerce. There was no proof of the marriage of her parents, or that any such persons as were named in the certificate of baptism had in point of fact any existence. Neither the pretended father nor any other relation was present at the baptism. Still, notwithstanding these grave circumstances, it was held that the party seeking to impeach her legitimacy was bound to show affirmatively that the pretended parents never had existed, or that if there were really any such persons, they never had been married, in order to rebut the presumption arising from the certificate of baptism and the subsequent possession of a *status*, in conformity with it. The Parliament of Provence in 1738, found in her favor, and M. de Gneidan, in giving the reasons for the judgment, says:—
" The registers of the priests are the sacred depositories of public faith, it is there the children find incontestable titles, of which neither the injustice of man, nor the succession of time, nor even the disavowal of fathers, can deprive them. If the baptismal extract of Thérèse Perrin does not state expressly that she was legitimate, it does not state that she was a natural daughter. It does not specify as it ought, the condition, station, or domicil of the godfather and godmother, and these sorts of omissions are but too ordinary with the priests. It is the effect of an inconsideration which cannot be sufficiently blamed, in the exercise of a ministry where every thing is of consequence. But the child ought not to suffer. *The simple quality of daughter of Francois Perrin and of Marguerite Espagnet which is given her, supposes that she is legitimate.*"

Finally, under such a state of the law and of the evidence as has now been exhibited, what should be the conclusion of the court upon the claim of Ferrié to the administration of the estate of his mother? That he was her son is undoubted— nothing can be more certain :—is the evidence sufficient to bastardize him? The transaction is ancient. It occurred at

a period when with the changes of law and the disorders of revolution, official regularity and the accuracy· of records were exposed to unusual chances. It occurred in a considerable town, where the affairs of an obscure and humble couple were not likely to attract much attention. But three contemporaries having knowledge of the circumstances, are living, and one of these was then a child of five years. The parties and their immediate relatives are all dead. Time and circumstance have thus shrouded much of the history in darkness, and it is now in vain we strive to raise the veil.— There are doubts and uncertainties which the candid mind must confess, but are we to indulge these—are we to be astute in spelling out defects and flaws, harboring suspicions, and promoting conjectures—shall the law, with cold and merciless argument, be intent upon following with the probe every humane presumption, and be careful to magnify every opposing fact—against a child claiming his maternal succession, and in behalf of distant collaterals? Certainly not. We approach, then, this question with the well settled rule and presumption of law in favor of marriage and legitimacy, a presumption not lightly or easily to be repelled. The evidence to overturn it must be clear and satisfactory, and irreconcilable with any other hypothesis than legitimacy. There must not be a mere balance of probabilities, slightly preponderating, but the opposing weight must be controlling.

Jeanne's desertion of her child and its father—her forming the acquaintance with Du Lux as a maiden, and her styling Ferrié, nephew, in her correspondence and occasionally in society, are not such controlling facts. Standing alone, they would have much force. But they do not stand alone, and moreover, are not unsusceptible of explanation. It is not ·difficult to see how they became consequent upon her first step from the path of rectitude after she had become a mother. Thread after thread of entanglement is woven in the web of human fortune, when concealment is once begun, until we hardly know where to find the clue. Again, the exclusion of a poor, friendless boy, from the succession to his grand-

father's property, doubtless tends to show he was not recognized as a part of the family, but that sometimes happens to orphans. These facts, in connection with the bans of marriage, and the parol evidence taken in France, as I have indicated it, are not in my judgment sufficient to countervail against the opposing proofs. The latter may be briefly stated as follows.

1. Ferrié, the claimant, is the son of Jeanne Du Lux, the intestate. 2. Valentin Ferrié was his father. 3. The parents were of good character. 4. They desired marriage. 5. They entered into a contract to marry. 6. They cohabited together. 7. The child was baptized as a legitimate child. 8. The child was baptized in his father's name. 9. Two members of the Ferrié family were sponsors. 10. The son through life has borne his father's name. 11. Valentin, the father, never formed another matrimonial engagement. 12. Jeanne, the mother, though living with Henri Du Lux, from 1804, never entered into a ceremonial contract of marriage with him until the summer of 1812, after she had time to hear the tidings of Valentin's death. 13. Immediately on her marriage with Du Lux, the latter proceeds to France and institutes an investigation for the purpose of discovering the child. 14. The mother herself, in 1815, makes a similar attempt in which she is successful, and at the place of his birth, recognizes him as her son, and provides for his maintenance and education. 15. She ultimately receives him at New York, and admits him to be her son. Nine of her associates have sworn to this fact. 16. She also declared him to be her heir and entitled to her property in case of intestacy. 17. She stated that she had been married to his father at the time of the French Revolution.—With all the presumptions of the law in favor of children and their legitimacy to aid these facts, even were the countervailing circumstances stronger, more numerous, and imposing than they are, I should be compelled to find in behalf of the claimant, and his title to the estate of his mother. There must, therefore, be sentence accordingly.